Filed 2/14/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re BREANNA S. et al., Persons Coming Under the Juvenile Court Law. | B275340 |
| | (Los Angeles County Super. Ct. No. DK05103) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| LYDIA O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Terry Truong, Juvenile Court Referee. Conditionally affirmed and remanded.

Jamie A. Moran, under appointment by the Court of Appeal, for Lydia O.

Patricia K. Saucier, under appointment by the Court of Appeal, for Jesse S.

Mary C. Wickham, County Counsel, R. Keith Davis, Assistance County Counsel, and David Michael Miller, Deputy County Counsel, for Respondent.

---

Lydia O. and Jesse S., the mother and presumed father of nine-year-old Breanna S. and four-year-old David S., appeal the juvenile court's May 17, 2016 order pursuant to Welfare and Institutions Code section 366.26[1] terminating their parental rights and identifying adoption as the permanent plan for Breanna and David. Lydia contends the juvenile court erred in ruling she had failed to establish the parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Jesse contends the court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the notice requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). Lydia has joined Jesse's ICWA notice argument (Cal. Rules of Court, rule 8.200(a)(5)). We agree the Department failed to comply with ICWA's notice requirements, remand the matter to allow the Department and the juvenile court to remedy that violation of federal and state law and otherwise conditionally affirm the order.

---

[1]     Statutory references are to this code unless otherwise stated.

2

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Dependency Petition and Review Hearings*

The juvenile court sustained an amended dependency petition on behalf of Breanna and David on July 28, 2014 pursuant to section 300, subdivisions (a) and (b), finding that Lydia and Jesse had a history of engaging in violent confrontations in the presence of the children, the children were frightened of Jesse due to those encounters, Jesse had violated a criminal court restraining order, and Lydia had failed to protect the children by remaining in the relationship despite multiple episodes of domestic violence. In addition, the court found that Jesse had a history of illicit drug abuse and was a current abuser of marijuana and alcohol, which rendered him incapable of providing regular care and supervision of the children. The court removed the children from Lydia's and Jesse's custody, placed them with their maternal grandmother and ordered family reunification services for both parents.

Between the children's detention on May 28, 2014 and the July 28, 2014 jurisdiction/disposition hearing, Lydia visited the children only twice.

Prior to the six-month review hearing (§ 366.21, subd. (e)) originally scheduled for mid-January 2015, Breanna and David were placed with their "maternal great cousins." Lydia and Jesse informed the Department they remained in a romantic relationship notwithstanding the past incidents of violence and wanted to reunify with their children as a family unit. Lydia's visitation remained infrequent.

At the continued six-month hearing on April 15, 2015 the court found Lydia and Jesse in partial compliance with their case plans and ordered the Department to continue to provide them

3

with reunification services. Lydia visited with the children twice in February 2015 and not at all in March 2015. She had three visits with them by mid-April.

At the 12-month review hearing in July 2015 (§ 366.21, subd. (f)) the court again found Lydia in partial compliance and ordered reunification services continued for her. Lydia failed to attend her scheduled visits with the children in June and July 2015. According to the relative caregivers' call log, Lydia had failed to call the children for scheduled telephone visits more than half the time.

Following a contested hearing in September 2015 the court terminated Jesse's services. He had failed to reenroll in a substance abuse class, as ordered, and had been discharged from his domestic violence program due to poor attendance.

On November 20, 2015 the court issued a temporary restraining order against Jesse at Lydia's request following a physical attack earlier that month. As reflected in the sustained petition and the Department's detention and jurisdiction reports, this was not the first restraining order Lydia had obtained against Jesse: A restraining order had previously been granted in May 2012 protecting Lydia and both children; Jesse had been arrested in February 2014 for violating that order, which prompted the referral of the family to the Department.

After a contested 18-month permanency review hearing (§ 366.22) on January 12, 2016, the court terminated Lydia's reunification services and set a selection and implementation hearing (§ 366.26) for May 9, 2016. Although Lydia had completed a parenting education class and a domestic violence program, she was not in compliance with the substance abuse component of her case plan. In addition, although Lydia had

4

previously identified depression and post-traumatic stress disorder as the reasons for her failure to consistently visit with the children, she was not obtaining any mental health treatment. Lydia reported she had resumed her relationship with Jesse and was again pregnant. The caregivers reported Lydia's visits with the children remained sporadic.

2. *The Selection and Implementation Hearing and Termination of Parental Rights*

In its report for the selection and implementation hearing, dated May 9, 2016, the Department advised the court that Breanna and David remained suitably placed with their maternal cousins, who continued to provide them with a stable home environment, meeting their physical, emotional and medical needs. The Department also reported the maternal cousins were committed to provide the children permanency through adoption in the event reunification for the parents failed and indicated the home study for the maternal cousins was nearly complete. In addition, according to the Department's social worker the children appeared happy and bonded with these caregivers, referring to them as "mom" and "dad."

Lydia's visits remained monitored; and her contact with the children was only sporadic. The caregivers reported Lydia often scheduled a visit and then failed to follow through. Jesse's visits were characterized as "inconsistent," occurring on average only twice a month.

At the request of counsel for the children, the hearing was continued; and the Department was directed to again interview Breanna, who was experiencing "some conflict" about the options for a permanent plan. In a report submitted May 17, 2016 the social worker stated Breanna was clear she wanted to be adopted

5

by her current caregivers; her "conflict" had to do with her concern about appearing disloyal to Lydia and Jesse.

The court denied Lydia and Jesse's request for Breanna to testify at the continued hearing, explaining her ambivalence was not in dispute and, given her age (eight years old at this point in the proceedings), her wishes with regard to the question of bonding were of minimal significance. Lydia testified her visits with the children had become more frequent during the preceding six months and blamed the caregivers for her previous infrequent visitation, but acknowledged she had not spent any holidays with Breanna and David, attended any of their medical appointments or otherwise spent any significant time in their home. Jesse also testified concerning his even more limited visitation with the children.

At the conclusion of the contested hearing the court found by clear and convincing evidence that it would be detrimental to the children to be returned to their parents, that Breanna and David were likely to be adopted in a reasonable time and that Lydia and Jesse had failed to establish the statutory parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). The court acknowledged that Breanna had a relationship with Lydia and Jesse, "that she will always see you as her mother and her father, but that is not enough."

The court reviewed the parents' visitation history and ruled, "I can't find that there has been a consistent and regular pattern of visitation. Your visitation has not changed from monitored from the time of the initial hearing on this case in May of 2014. It has yet to change to unmonitored because you failed to do what the court ordered you to do, and you get into another physical altercation with each other." The court additionally

6

ruled there was insufficient evidence to show the children would benefit from continuing the parent-child relationship, noting that Breanna did not want to return to Lydia because she was afraid Jesse was going to be around. Accordingly, the court terminated Lydia and Jesse's parental rights and reconfirmed adoption as the children's permanent plan.

3. *Investigation of Indian Ancestry and ICWA Notice*

On her Judicial Council form ICWA-020, Parental Notification of Indian Status, filed on May 20, 2014, the date of the initial detention hearing, Lydia indicated she may have Indian ancestry, identifying the Apache and Yaqui tribes. Similarly, the detention report filed by the Department stated "[t]he Indian Child Welfare Act may apply," explaining that Lydia had disclosed she may have American Indian ancestry, naming the Yaqui and Apache tribes but stating she had no further information.[2] The juvenile court ordered the Department to investigate Lydia's possible Indian ancestry, to give notice to the proper tribe or tribes and the Bureau of Indian Affairs (BIA), if appropriate, and to include the information concerning her ancestry in its next report to the court.

In its jurisdiction/disposition report dated June 12, 2014 the Department advised the court it had interviewed Lydia regarding her Indian ancestry and Lydia had stated "she has possibly Yaqui Indian heritage from her great [sic] grandmother."

_____

[2] Jesse's form ICWA-020, filed May 23, 2014, stated he had no Indian ancestry as far as he knew. When asked about Jesse's possible Indian ancestry, Lydia responded, "He doesn't have any American Indian ancestry. I think it's only me and my side of the family."

7

(The relative discussed was actually Lydia's maternal grandmother and the children's maternal great-grandmother.) Lydia did not know her grandmother's name but indicated her mother, Esperanza M., might have more information. A dependency investigator then met with Esperanza, who stated there was possible Indian ancestry in the Yaqui tribe through the children's maternal great-grandmother. Esperanza provided the maternal great-grandmother's name (Matilde S.), date of birth, state of birth (New Mexico) and date of death and state where she died (California). Esperanza also reported that, although Matilde was not "registered," "'she would always say we were Yaqui." Esperanza also gave the investigator the name of her father (the maternal great-grandfather), his date of birth and the year and state in which he died.

Based on the information provided, the Department reported, ICWA notices had been processed and sent by registered mail to the Yaqui tribe, the federal BIA and the United States Secretary of the Interior. No return receipts or response from the tribe had been received by the date of the jurisdiction/disposition report. Nonetheless, the Department recommended that the court make ICWA findings as to both Lydia and Jesse.

By the date of the continued jurisdiction/disposition hearing on July 28, 2014, the Department had received a letter from the Pascua Yaqui tribe, dated July 16, 2014, which stated its enrollment department had indicated Breanna, David, Lydia and Jesse were not members of the tribe and did not have applications for membership pending. The letter continued, "Based upon the family information provided and the current

8

enrollment records, the children are not eligible for membership and the Tribe will not intervene in this matter."

At the combined jurisdiction/disposition hearing the juvenile court found there was no reason to know either Breanna or David was an Indian child within the meaning of ICWA. The court ordered the parents to keep the Department and the court aware of any new information relating to possible ICWA status.

## DISCUSSION

1. *The Juvenile Court Did Not Err in Ruling Lydia Had Failed To Establish the Parent-child Relationship Exception to Termination of Parental Rights*

a. *Governing law and standard of review*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"]; *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[I]f the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody," and the court then must "concentrate its

9

efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"]; see also *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299-1300; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1163.)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing. First, the court determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B); see *Cynthia D.*, at pp. 250, 259 [when the child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

One of the statutory exceptions to termination is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order some other permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The exception requires the parent to prove both that he or she has maintained regular visitation and that his or her relationship with the child "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; accord, *In re Amber M.* (2002) 103 Cal.App.4th 681, 689; see *In re Autumn H.* (1994)

10

27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)

A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 466 ["[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "'emotional bond'" with the child, "'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.) Factors to consider include "'"[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."'" (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643.) Moreover "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The parent has the burden of proving the statutory exception applies. (*In re I.W., supra,* 180 Cal.App.4th at p. 1527; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The court's decision a parent has not satisfied this burden may be based on

11

any or all of the component determinations—whether the parent has maintained regular visitation, whether a beneficial parental relationship exists, and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re K.P., supra,* 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) When the juvenile court finds the parent has not maintained regular visitation or established the existence of the requisite beneficial relationship, our review is limited to determining whether the evidence compels a finding in favor of the parent on this issue as a matter of law. (*In re I.W.,* at pp. 1527-1528 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"]; see *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1157.) When the juvenile court concludes the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion. (*In re K.P.*, at pp. 621-622; *In re Bailey J.*, at pp. 1314-1315.)

   b. *Lydia failed to establish the (c)(1)(B)(i) exception to termination of parental rights*

Lydia contends she established the existence of a beneficial parental relationship with the children within the meaning of section 366.26, subdivision (c)(1)(B)(i), because, contrary to the juvenile court's finding, she maintained regular visitation and

12

had a strong bond with both children.[3]  However, the record does not compel a finding that regular visitation occurred or demonstrate the juvenile court abused its discretion in concluding Lydia's relationship with the children did not outweigh the well-being they would gain in a permanent home with adoptive parents.

As discussed, there was ample evidence in the record that Lydia visited with Breanna and David only sporadically during the first 18 months of the dependency proceedings, often cancelling visits that had been arranged.  While her visits apparently became more regular during the final six months before the section 366.26 hearing, even then they occurred only once a week for two hours per visit.  Lydia's testimony did not compel a finding, as a matter of law, that she had maintained regular visitation and contact with the children, as required for the parent-child relationship exception to termination of parental rights to apply.  (See *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 ["'Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption.' [Citation.]  The type of parent-child relationship sufficient to derail the statutory preference for adoption is one in which 'regular visits and contact have continued or developed a significant, positive, emotional attachment from parent to child.' [Citation.]  Such relationship 'arises from day-to-day interaction, companionship and shared experiences.'"].)

In addition, the juvenile court's determination the benefits of adoption for the children far outweighed those from continuing

_____

[3]      Lydia does not dispute the juvenile court's finding the children were likely to be adopted.

13

their relationship with Lydia and Jesse was well within its discretion. To be sure, Lydia acted appropriately when she saw the children during her monitored visits—playing with them and helping Breanna with her arithmetic and spelling and David with his ABC's—and Breanna expressed mixed feelings about the prospect of adoption. But this evidence falls far short of demonstrating a substantial emotional attachment that would cause the children to suffer great harm if severed. (See *In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 107 [parent-child relationship exception requires parent to demonstrate "relationship remained so significant and compelling in [the child'] life that the benefit of preserving it outweighed the stability and benefits of adoption"]; *In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315 [juvenile court determines "the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption"]; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 [exception applies only if the severance of the parent-child relationship would "deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed"].) It was the caregivers/prospective adoptive parents, not Lydia, who ensured Breanna and David's ongoing needs, both physical and emotional, were being met. Lydia simply failed to show she occupied "a parental role" in her children's life. (See *In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.) Furthermore, in balancing the benefit to Breanna and David of adoption and the possible detriment from terminating their relationship with their mother, the juvenile court properly expressed concern over the continuing violence that characterized Lydia's relationship with Jesse, the

14

very reason that dependency jurisdiction was exercised in the first place. (See *In re Noah G.*, *supra*, 247 Cal.App.4th at p. 1302 [in considering the parent-child relationship exception to termination of parental rights, "the juvenile court could properly focus on the mother's unresolved substance addiction issues because the children became dependents of the court due to her drug abuse"].) For all these reasons, the juvenile court properly found the parent-child relationship exception did not apply in this case.

2. *The Department Failed To Satisfy Its Notice Obligation Under ICWA*

a. *The ICWA notice requirements*

Congress enacted ICWA in 1978 to address an "Indian child welfare crisis . . . of massive proportions"—an estimated 25 to 35 percent of all Indian children had been separated from their families and placed in adoptive homes, foster care or institutions. (H.R.Rep. No. 95-1386, 2d Sess., p. 9 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 7530, 7531.) Although this crisis was the product of several related causes, Congress expressly found that State agencies and courts had often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. (25 U.S.C. § 1901(5).) To address this failure, protect Indian children and promote the stability and security of Indian tribes and families, ICWA establishes minimum federal standards a state court must follow before removing an Indian

15

child from his or her family. (25 U.S.C. § 1902; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8; *In re W.B.* (2012) 55 Cal.4th 30, 47.)[4]

As the California Supreme Court recently explained, notice to Indian tribes is central to effectuating ICWA's purpose, enabling a tribe to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the matter. (*In re Isaiah W.*, *supra*, 1 Cal.5th at pp. 8-9.)[5] ICWA provides, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a).) Similarly, California law requires notice to the Indian custodian and the Indian child's tribe in accordance with section 224.2, subdivision (a)(5), if the Department or court knows or has reason to know that an Indian child is involved in the

---

[4] ICWA thus reflects the congressional determination it is in the best interests of Indian children to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations. (25 U.S.C. § 1902; *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 8; see *In re H.G.* (2015) 234 Cal.App.4th 906, 909-910; *In re Alexandria P.* (2014) 228 Cal.App.4th 1322, 1355-1356; see also § 224, subd. (a).)

[5] For purposes of ICWA, an "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); see § 224.1, subd. (a) [adopting federal definitions].)

proceedings. (§ 224.3, subd. (d); see Cal. Rules of Court, rule 5.481(b)(1) [notice is required "[i]f it is known or there is reason to know that an Indian child is involved in a proceeding listed in rule 5.480," which includes all dependency cases filed under Welfare and Institutions Code section 300].)[6]

ICWA itself does not define "reason to know," nor did the implementing federal regulations in effect while this case was pending in the dependency court. (See former 25 C.F.R. § 23.11; *In re H.B.* (2008) 161 Cal.App.4th 115, 121, fn. 3; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1158.)[7] However, California statutory law,

---

[6] If the court has reason to know an Indian child may be involved in the pending dependency proceeding but the identity of the child's tribe cannot be determined, ICWA requires notice be given to the BIA (25 U.S.C. §§ 1903(11), 1912(a); see *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 8.) California law reinforces this requirement: Section 224.2, subdivision (a)(4), provides, "Notice, to the extent required by federal law, shall be sent to the Secretary of the Interior's designated agent, the Sacramento Area Director, Bureau of Indian Affairs." In addition, the California statute requires any notice sent to the child's parents, Indian custodians or tribe to "also be sent directly to the Secretary of the Interior" unless the Secretary has waived notice in writing. (§ 224.2, subd. (a)(4); *In re Isaiah W.*, at p. 9.)

[7] New regulations to implement ICWA, adopted as of December 12, 2016, now identify circumstances in which a court has "reason to know" the child is an Indian child, including if "[a]ny participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child." (25 C.F.R. § 23.107(c)(2).) The new regulations apply to any child custody proceeding initiated on or after December 12, 2016, even if the child has been involved,

17

which incorporates and enhances ICWA's requirements (see *In re W.B.*, *supra*, 55 Cal.4th at p. 52 [discussing passage of Senate Bill No. 678 (2005-2006 Reg. Sess.)]), provides the circumstances that may provide reason to know the child is an Indian child include, without limitation, when a member of the child's extended family provides information suggesting the child is a member of a tribe or eligible for membership in a tribe or one or more of the child's parents, grandparents or great-grandparents are or were a member of a tribe.  (§ 224.3, subd. (b)(1); see *In re Isaiah W., supra*, 1 Cal.5th at p. 15 ["section 224.3, subdivision (b) sets forth a nonexhaustive list of 'circumstances that may provide reason to know the child is an Indian child'"]; see also *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1386-1387 & fn. 9 [because only the tribe may make the determination whether the child is a member or eligible for membership, there is no general blood quantum requirement or "remoteness" exception to ICWA notice requirements]; *In re B.H.* (2015) 241 Cal.App.4th 603, 606-607 ["a person need not be a *registered* member of a tribe to be a member of a tribe—parents may be unsure or unknowledgeable of their own status as a member of a tribe"].)

Under the then-effective implementing federal regulations, ICWA notices, when required, had to include "[a]ll names known, and current and former addresses of the Indian child's biological mother, biological father, maternal and paternal grandparents

in dependency proceedings prior to that date.  A "child-custody proceeding" includes, as a separate proceeding, a termination of parental rights, a preadoptive placement or an adoptive placement.  (25 U.S.C. § 1903(1); 25 C.F.R. § 23.2.)  If any one of those types of proceedings is initiated on or after December 12, 2016, the new regulations apply to that proceeding.

and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information." (Former 25 C.F.R. § 23.11(a), (d)(3) (2014).)[8] In nearly identical language California law requires that ICWA notices include "all names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married and former names or aliases, as well as their current and former addresses, birthdates, places of birth and death, tribal enrollment numbers, and any other identifying information, if known." (§ 224.2, subd. (a)(5)(C).) The Judicial Council's mandatory form, Notice of Child Custody Proceeding for Indian Child (Indian Child Welfare Act), ICWA-030, adopted effective January 1, 2008 and used by the Department in this case, includes boxes for the required information, including birth date and place, for each parent, each parent's biological mother and father (the child's maternal and paternal grandparents) and each parent's four biological grandparents (the child's maternal and paternal great-grandparents).

---

[8]     The new ICWA regulations require that notice include, in addition to information about the child and his or her parents, "[i]f known, the names, birthdates, birthplaces, and Tribal enrollment information of other direct lineal ancestors of the child, such as grandparents." (25 C.F.R. §§ 23.11(a), 23.111(d)(1)-(3).)

19

b. *The Department has conceded it omitted required information from the ICWA notice*

Jesse, joined by Lydia, argues the notices sent to the Yaqui tribe by the Department omitted information required by federal and state law to be included in ICWA notices: the maternal grandmother's former addresses and place of birth, the maternal grandfather's current and former addresses, the maternal great-grandmother's place of birth and death and the maternal great-grandfather's place of birth and death. In response the Department concedes certain of this information—the maternal grandmother's former address and place of birth, the maternal great-grandmother's place of birth and place of death and the maternal great-grandfather's place of death—was known to it and included in its jurisdiction/disposition report to the court, but omitted from the ICWA notices. The Department admits this was "a mistake," but contends the error was harmless, an issue we consider in the following section of this opinion. As to the other omitted information identified by Jesse, the Department argues nothing in the record indicates this information was known or even ascertainable.

This latter contention appears to misapprehend the Department's "affirmative and continuing duty" to make the inquiries necessary to determine whether a dependent child is or may be an Indian child. (*In re Isaiah W., supra*, 1 Cal.5th at p. 9; § 224.3; Cal. Rules of Court, rule 5.481.)[9] This affirmative duty is

---

[9] California Rules of Court, rule 5.481(a)(4)(A) directs the social worker to conduct interviews "to gather the information listed in Welfare and Institutions Code section 224.2(a)(5), . . . which is required to complete the *Notice of Child Custody Proceeding for Indian Child* (form ICWA-030)."

triggered whenever the child protective agency or its social worker "knows or has reason to know that an Indian child is or may be involved" (Cal. Rules of Court, rule 5.481(a)(4)), and obligates the social worker, as soon as practicable, to interview the child's parents, extended family members and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); Cal. Rules of Court, rule 5.481(a)(4)(A); see *In re Michael V.* (2016) 3 Cal.App.5th 225, 233; *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; see also *In re Alice M.* (2008) 161 Cal.App.4th 1189, 1200 ["the duty to inquire is triggered by a lesser standard of certainty regarding the minor's Indian child status . . . than is the duty to send formal notice to the Indian tribes"].) Although the Department's investigator interviewed Lydia and Esperanza regarding the family's Indian ancestry, it does not appear either of them was asked about the maternal grandfather (Esperanza's husband) or that the Department made any effort to locate him for an interview. Nor is there any indication the Department attempted to learn the place of birth of the maternal great-grandfather (Luis M., the husband of Matilde), which was omitted from the ICWA notice. Contrary to the Department's position on appeal, it was the social worker's duty to seek out this information, not the obligation of family members to volunteer it. (See *In re Michael V.*, at p. 236 ["[i]t was not the paternal great-aunt's obligation to speak up; it was the Department's obligation to inquire"].)

### c. *Omission of information mandated by federal law requires that ICWA notices be resent*

While conceding its mistake in omitting required information from the ICWA notices, the Department contends the

omissions were harmless error in light of the Yaqui tribe's conclusion, based on the substantial biographical data that were provided, that Breanna and David are not members of the tribe or eligible for membership in the tribe. It is not reasonably likely, the Department argues, the tribe's response would have been any different if the notices had included the additional information. (See, e.g., *In re D.N.* (2013) 218 Cal.App.4th 1246, 1251 ["[d]eficiencies in ICWA inquiry and notice may be deemed harmless error when, even if proper notice had been given, the child would not have been found to be an Indian child"]; *In re Cheyanne F.* (2008) 164 Cal.App.4th 571, 576 ["where notice has been received by the tribe, . . . errors or omissions in the notice are reviewed under the harmless error standard"].)

In evaluating the harmless error argument, it is essential to distinguish between violation of notice requirements imposed by ICWA itself and the federal regulations implementing it, on the one hand, and violations of state standards for inquiry and notice that are higher than those mandated by ICWA, on the other hand.[10] As to the former, "ordinarily failure in the juvenile court to secure compliance with the Act's notice provisions is prejudicial error." (*In re Marinna J.* (2001) 90 Cal.App.4th 731, 736; accord, *In re Kahlen W.* (1991) 233 Cal.App.3d 1414, 1424 ["[c]ourts have consistently held failure to provide the required notice requires remand unless the tribe has participated in the

---

[10] ICWA authorizes the states to provide "a higher standard of protection to the rights of the parent . . . of an Indian child than the rights provided under [ICWA]." (25 U.S.C. § 1921.) Section 224, subdivision (d), states, if California law provides such a higher standard of protection, "the court shall apply the higher standard."

proceedings or expressly indicated they have no interest in the proceedings"]; see *In re Cheyanne F.*, *supra*, 164 Cal.App.4th at p. 577 ["[d]eficiencies in an ICWA notice are generally prejudicial, but may be deemed harmless under some circumstances"].) Any failure to comply with a higher state standard, however, "must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error. (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*In re S.B.*, at p. 1162; accord, *In re H.B.*, *supra*, 161 Cal.App.4th at p. 121 ["[a] violation of ICWA notice requirements may be harmless error, particularly when, as here, the source of the duty to inquire is not ICWA itself but rather former rule 1439(d), a rule of court implementing ICWA"].)

This vigilance in ensuring strict compliance with federal ICWA notice requirements is necessary because a violation renders the dependency proceedings, including an adoption following termination of parental rights, vulnerable to collateral attack if the dependent child is, in fact, an Indian child. (See 25 U.S.C. § 1914 ["[a]ny Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated [specified provisions of ICWA, including the provisions requiring notice and mandating the content of the notice]"].) "'To maintain stability in placements of children in juvenile proceedings, it is preferable to err on the side of giving notice and examining thoroughly

23

whether the juvenile is an Indian child.'" (*In re D.C.* (2015) 243 Cal.App.4th 41, 63.)

Here, the Department violated the requirements of both federal and state law regarding the content of an ICWA notice. Although the Pascua Yaqui tribe responded that the children were not members of, or eligible for membership in, the tribe, the tribe's letter explained its assessment was "[b]ased upon the family information provided." Some of the omitted information pertained directly to the maternal great-grandmother, the ancestor who Lydia and Esperanza had affirmatively identified as a Yaqui Indian. We cannot say with any degree of confidence that additional information concerning that relative, her husband and her daughter would not have altered the tribe's evaluation.

In an additional harmless error argument, the Department asserts, based on language in the Constitution of the Pascua Yaqui Tribe,[11] that membership in the Pascua Yaqui Tribe requires a minimum blood quantum of one-quarter. Even if Matilde, the maternal great-grandmother and the only person identified by Lydia and Esperanza as having Yaqui ancestry, was of full blood quantum, the Department continues, Breanna and David could at most be one-eighth blood quantum Yaqui, thus making them ineligible for tribal membership.

We recognize an analysis similar to that suggested by the Department has been made in other cases, although the relative involved typically has been more distant than the child's great-

---

[11] The Department moved in this court for judicial notice of the Constitution of the Pascua Yaqui Tribe. Jesse opposed the request in his reply brief. We grant the motion. (See *In re J.M.* (2012) 206 Cal.App.4th 375, 382 ["[c]ourts routinely take evidence of tribes' membership criteria in ICWA proceedings"].)

24

grandparent. (See, e.g., *In re J.M.* (2012) 206 Cal.App.4th 375, 382 ["given the stringency of tribal membership requirements," any error in failing to include the names of the children's great-great-grandparents in the ICWA notices was harmless "because these children are disqualified from membership irrespective of their great-great-grandparents' possible membership in the tribe"]; *In re Shane G.*, *supra*, 166 Cal.App.4th at p. 1539 [although maternal grandmother indicated Shane's great-great-great-grandmother was a Comanche princess, notice was not required; "[m]ost significantly, the evidence before the court showed the Comanche tribe requires a minimum blood quantum for membership that exclude[d] Shane"].) Those cases notwithstanding, the Indian tribe, not the juvenile court or the court of appeal, is the sole entity authorized to determine whether a child who may be an Indian child is actually a member or eligible for membership in the tribe. (See *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 21 [98 S.Ct. 1670, 56 L.Ed.2d 106] [Indian tribe is final arbiter of its membership rights]; § 224.3, subd. (e)(1) ["[a] determination by an Indian tribe that a child is or is not a member of or eligible for membership in that tribe . . . shall be conclusive"]; *In re Kadence P.*, *supra*, 241 Cal.App.4th at pp. 1386-1387 [the Indian tribe, not the court, determines whether the child is an Indian child]; *In re Francisco W.* (2006) 139 Cal.App.4th 695, 702 [same]; see also *In re Abbigail A.* (2016) 1 Cal.5th 83, 95 ["membership . . . is a tribe's determination based on tribal law," while a child's status as an Indian child "is a conclusion of federal and state law based on the tribe's determination"].)[12] Accordingly, although the

---

[12] The new federal ICWA regulations provide, "The

25

Department accurately quotes language from the Pascua Yaqui constitution, we are unwilling to determine in the first instance the tribe's membership eligibility requirements, particularly since we are without benefit of testimony regarding how that language has been applied by the tribe and whether exceptions have been created by tribal custom and practice.

Moreover, once ICWA notice is required, as it plainly was in this case, we would be extremely reluctant under most circumstances to foreclose the tribe's prerogative to evaluate a child's membership rights without it first being provided all available information mandated by ICWA. That reluctance is controlling here, given the absence in the ICWA notices of information concerning not only the maternal great-grandmother, but also Luis M., Matilde's husband and the children's maternal great-grandfather. (Cf. *In re J.M.*, *supra*, 206 Cal.App.4th at p. 383 ["[t]his is not a case where there are gaps in the family tree, frustrating the [tribe's] ability to meaningfully investigate the children's eligibility for membership"].)

We remand the matter for the juvenile court to conduct a further investigation into Lydia's claim of Indian ancestry by making a genuine effort to locate other family members who might have information bearing on the issue. Once that investigation is completed, new notices must be provided to the Pascua Yaqui Tribe and the Secretary of the Interior. The Department shall thereafter notify the court of its actions and file

---

determination by a Tribe of whether a child is a member, whether a child is eligible for membership, or whether a biological parent is a member, is solely within the jurisdiction and authority of the Tribe, except as otherwise provided by Federal or Tribal law." (25 C.F.R. § 23.108(b).)

certified mail return receipts for the new ICWA notices, together with any responses received.  The court shall then determine whether ICWA and state law inquiry and notice requirements have been satisfied and whether Breanna and David are Indian children.  If the court finds they are Indian children, it shall conduct a new section 366.26 hearing, as well as all further proceedings, in compliance with ICWA and related California law.  If not, the court's original section 366.26 order remains in effect.

## DISPOSITION

The juvenile court's May 17, 2016 section 366.26 order is conditionally affirmed.  The matter is remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.


PERLUSS, P. J.


We concur:



ZELON, J.



SEGAL, J.