Filed 11/17/20  In re Valerie G. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re VALERIE G. et al., Persons Coming Under the Juvenile Court Law. | B305195 <br><br> (Los Angeles County Super. Ct. No. DK01399A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JOSEPH C. et al., <br><br> Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Juvenile Court Referee. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant Joseph C.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant Marissa G.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

———————————

Joseph C. and Marissa G., the parents of 12-year-old Valerie G., 10-year-old Bella C. and eight-year-old Jolina C.,[1] appeal the juvenile court's March 10, 2020 order terminating their parental rights after a contested hearing pursuant to Welfare and Institutions Code section 366.26.[2]  Joseph contends the court erred in ruling he had failed to establish the parent-child-relationship exception to termination of parental rights pursuant to section 366.26, subdivision (c)(1)(B)(i).  Marissa joins Joseph's argument.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Proceedings Prior to the Termination of Parental Rights*

Valerie, Bella and Jolina were originally detained in November 2013 and declared dependents of the juvenile court in January 2014 after the court sustained allegations that Joseph and Marissa's home was infested with roaches and otherwise unsanitary, creating a hazardous condition for the children, and that Jolina had ingested detergent that had not been stored

---

[1]  The juvenile court determined Joseph is the presumed father of all three children, but is not Valerie's biological father.

[2]  Statutory references are to this code.

2

safely.  The children were removed from Joseph's and Marissa's custody and placed with Jennifer H., a paternal aunt, and her husband, Victor H.  Visitation was originally monitored, but soon liberalized to unmonitored.  The court terminated its jurisdiction in March 2015.

The children were again detained in January 2016 based on allegations that the family home was roach infested, filthy and unsanitary and that Marissa had failed to provide necessary medical care for Valerie's asthma.  The children were once more placed with Jennifer and Victor.  In May 2016 the court sustained an amended petition pursuant to section 300, subdivision (b), alleging the family home was unsanitary and unsafe; Marissa had failed to ensure that Valerie received necessary medical treatment; and Joseph and Marissa had untreated mental health issues, combined with intellectual disabilities, that interfered with their ability to obtain services, creating a risk of harm to the children.  The children were declared dependents of the juvenile court and removed from Joseph's and Marissa's custody.  Family reunification services were ordered including monitored visitation.  The children remained placed with Jennifer and Victor.

At the six-month review hearing in November 2016, Joseph and Marissa were found to be in partial compliance with their case plans.  The court ordered each parent to have one weekly two-hour unmonitored visit.  Unmonitored visitation was increased to four hours per week at the 12-month review hearing in July 2017, and reunification services were continued.

In its November 2017 report for the 18-month review hearing the Los Angeles County Department of Children and Family Services (Department) advised the court that Joseph and

3

Marissa were partially compliant with their case plans and were inconsistent with their visits with the children, cancelling many visits due to lack of funds (although the Department had provided bus passes) or oversleeping. In a supplemental report dated January 16, 2017 the Department stated the parents had missed additional visits on December 4, 2017 and January 7, 2018.

The 18-month review hearing was continued several times. The parents' visits with the children remained sporadic. Finally, on September 11, 2018 the court determined the parents' progress had been minimal, terminated reunification services and scheduled a selection and implementation hearing pursuant to section 366.26. Jennifer and Victor indicated they wanted to adopt all three girls.[3]

2. *The Selection and Implementation Hearing and Termination of Parental Rights*

The section 366.26 hearing was continued multiple times, ultimately taking place as a contested proceeding on March 5 and 10, 2020. In its initial report for the section 366.26 hearing, dated January 3, 2019, the Department recommended that Joseph's and Marissa's parental rights be terminated and the children be adopted by Jennifer and Victor, with whom they had been living since January 2016. According to the Department, Jennifer and Victor provided for the children's physical, developmental, emotional and psychological needs, actively participating in their day-to-day activities. Joseph's and

---

[3]     Jennifer is considered a paternal relative to Bella and Jolina and a nonrelated extended family member to Valerie.

Marissa's visitation was described by Jennifer as "hit or miss." They would visit consistently for a few weeks and then miss visits.  In its reports the Department indicated the children were happy in Jennifer's home and described Jennifer as providing the children with phenomenal care.

In a supplemental section 366.26 report filed December 13, 2019 (prepared for the hearing then-scheduled for January 7, 2020) the Department responded to the court's order that it address "the quantity, quality, and frequency of visitation by the mother and father."  The Department explained a four-hour unmonitored visit was scheduled for each Sunday from 11:00 a.m. to 3:00 p.m.  Because he was incarcerated, Joseph was not visiting with the children.[4]  Marissa did visit, but not consistently.  The report identified nine weekly visits Marissa had cancelled from mid-August to mid-December and stated there were concerns about the visits Marissa did make "in that the mother and the [maternal] grandmother,[5] who was present at the visits, talk[ ] about negative things about prospective adoptive family to and/or in front of the children."  In addition,

[4]     Joseph was arrested in December 2018 and housed in the Los Angeles Men's Central Jail.  While incarcerated, Joseph spoke by telephone to the children on Sundays.  He was released from custody on February 11, 2020 and visited with the children in person on several subsequent Sundays prior to the section 366.26 hearing.

[5]     The report refers to the paternal grandmother, but in her testimony at the section 366.26 hearing Marissa confirmed it was the maternal grandmother who had been present at the visits.

5

Jennifer reported the children behaved more aggressively after their visits with their mother.

As for the children's current placement with Jennifer and Victor, who had been identified as prospective adoptive parents, the Department reported the children appeared to be comfortable in the home and described Jennifer and Victor as ensuring the children's basic needs, actively participating in their services and having "a strong bond with the children."

In a status review report for the March 2020 hearing the Department described the children as "content in the home of their caregiver. . . . Valerie, Bella, and Jolina are all doing well in school, they participate in extracurricular activities, and their medical/dental appointments are up to date. . . . The caregiver has demonstrated her bond with the children, and she stated on numerous occasions that she is more than willing to advocate and protect the children from harmful or hurtful situations."

The report repeated the description of Marissa's inconsistent visitation contained in the prior report to the court and stated that during the current supervision period her visits had remained "sporadic." As for Joseph, the social worker talked to each of the children regarding visiting him while he was in custody. Bella said she wanted to see her father, "but not in jail." Jolina said she would rather wait until he was released. Jennifer told the social worker, "He missed visits when he was not incarcerated, and I feel it is bad enough the girls know their father is in jail. I do not feel it is a positive environment for the girls to visit."

With respect to the possibility of adoption by Jennifer and Victor, Valerie said, "I am ok with being adopted. I will get to see my mother and father still." Bella said, "I do not want to leave

my home!  I am happy being adopted."  And Joline responded, "I never want to leave here!  I have been with [Jennifer] longer than with my parents.  I am good with just visiting my mom and dad."  Jennifer confirmed that, if adopted, the children would still be able to visit with Marissa and Joseph.

Marissa testified at the section 366.26 hearing on March 5, 2020.  Marissa acknowledged that neither she nor Joseph helped the children with homework during their visits and conceded she did not know the names of any of their friends and did not know if they were current with their shots.  She had not attended any of their school programs.  The maternal grandmother accompanied Marissa on all her visits and assisted in caring for the children until the maternal grandmother was no longer approved to be there (at some point in 2019).[6]

Joseph attended the hearing, represented by counsel, but did not testify or offer any evidence.

After hearing closing argument on March 10, 2020, the court found by clear and convincing evidence the children are adoptable and it would be detrimental to return them to either parent.  With respect to the parent-child-relationship exception to termination of parental rights, the court stated, "the most telling piece of information and evidence came from the mother herself when she indicated that the maternal grandmother was doing most of the caretaking during the visits, that she allowed that to occur."  The court added it was clear from Marissa's testimony

[6]     On cross-examination Marissa admitted it has been more difficult for her to care for the children during unmonitored visits without the maternal grandmother.  She explained, "My girls have said that it was boring without their grandma being there."

7

that she knew very little information about her children that a parent would normally know.  Although Marissa had explained her lack of information was due to Jennifer's unwillingness to provide it to her, the court emphasized that Marissa "did not present any information of any attempt during the visitation to learn information about the day-to-day interests and needs of the children, and by her own testimony she did not actively parent these children during the unmonitored visitation."

After concluding there had been no active parenting by Marissa, the court stated, "The father presented no evidence in that regard at all, although he had the opportunity to do so." Accordingly, the court ruled, "The benefit, if any, that can be found in the visitation between the children and the mother and the father clearly does not outweigh the benefit [of] permanence and stability that they will receive through adoption . . . .  So the court finds for the reasons stated that no exception to adoption applies to this case."[7]  The court terminated Marissa's and

[7]   The minute orders for the March 10, 2020 hearing state, in part, "The Court finds that the parent has not maintained regular visitation with the child and has not established a bond with the child."  In fact, the juvenile court did not address the question of regular visitation at the section 366.26 hearing, let alone make a finding adverse to the parents on that issue. (See *In re Nia A.* (2016) 246 Cal.App.4th 1241, 1247, fn. 1 [oral pronouncement generally prevails over inconsistent minute order]; *In re A.C.* (2011) 197 Cal.App.4th 796, 799-800 [same].) Misstatements of this potential significance in the court's minute orders, likely the result of the clerk's use of a standardized form, are a disservice to the parties and to this court.  The Department exacerbates the problem by arguing in its respondent's brief that such a finding was made, while citing to the pages in the

8

Joseph's parental rights,[8] transferred care, custody and control of the children to the Department for adoptive planning and placement and designated Jennifer and Victor as the children's prospective adoptive parents.

Both Joseph and Marissa filed timely notices of appeal.[9]

## DISCUSSION

1. *Governing law and standard of review applicable to the termination of parental rights*

The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).)  Once the court has decided to end parent-child reunification services, the legislative preference is for adoption.  (§ 366.26, subd. (b)(1); *In re S.B.* (2009) 46 Cal.4th 529, 532 ["[i]f adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child"]; *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[I]f the child is adoptable . . . adoption is the norm.  Indeed, the court must order adoption and

---

reporter's transcript that demonstrate the juvenile court did not discuss the point.

[8]    The court also terminated the parental rights of Valerie's biological father.

[9]    In her brief on appeal Marissa does not challenge the juvenile court's ruling that she failed to establish the parent-child-relationship exception.  Marissa simply joins the arguments raised by Joseph (Cal. Rules of Court, rule 8.200(a)(5)) and notes that, pursuant to California Rules of Court, rule 5.725(f), if this court reverses the termination of Joseph's parental rights, her rights should be reinstated as well.

9

its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody," and the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"]; see also *In re Breanna S.* (2017) 8 Cal.App.5th 636, 645-646; *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1299-1300.)

Section 366.26 requires the juvenile court to conduct a two-part inquiry at the selection and implementation hearing. First, the court determines whether there is clear and convincing evidence the child is likely to be adopted within a reasonable time. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250; *In re D.M.* (2012) 205 Cal.App.4th 283, 290.) Then, if the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of the enumerated statutory exceptions applies. (§ 366.26, subd. (c)(1)(A) & (B); see *Cynthia D.*, at pp. 250, 259 [when the child is adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

One of the statutory exceptions to termination is contained in section 366.26, subdivision (c)(1)(B)(i), which permits the court to order some other permanent plan if "[t]he parents have maintained regular visitation and contact with the child and the

10

child would benefit from continuing the relationship." The exception requires the parent to prove both that he or she has maintained regular visitation and that his or her relationship with the child "'"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643; accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 76; *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 646; see *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)

A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 466 ["[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent"].) No matter how loving and frequent the contact, and notwithstanding the existence of an "'emotional bond'" with the child, "'the parents must show that they occupy "a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621; accord, *In re Breanna S., supra,* 8 Cal.App.5th at p. 646.) Factors to consider include "'"[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."'" (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643.) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court

11

has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; accord, *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 [the issue is not whether there was a bond between father and son but whether "that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption"].)

The parent has the burden of proving the statutory exception applies. (*In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 781; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826.) The court's decision a parent has not satisfied this burden may be based on any or all of the component determinations—whether the parent has maintained regular visitation, whether a beneficial parental relationship exists, and whether the existence of that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); see *In re K.P., supra,* 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) We review for abuse of discretion the determination whether the benefit to the child derived from preserving parental rights is sufficiently compelling to outweigh the benefit achieved by the permanency of adoption. (*In re K.P.*, at pp. 621-622; *In re Bailey J.*, at pp. 1314-1315.) When the issue on appeal turns on a failure of proof at trial, we ask whether the evidence compels a finding in favor of the appellant as a matter of law. (*In re Luis H.* (2017)

14 Cal.App.5th 1223, 1226; see also *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.)[10]

### 2. *Joseph failed to establish the parent-child-relationship exception to termination of parental rights*

Joseph does not challenge the court's findings it would be detrimental to his children to be returned to his or Marissa's care and his daughters are likely to be adopted, nor does he question Jennifer and Victor's willingness and ability to meet the children's needs. He asserts only that it would be in the children's best interest to approve a permanent plan of legal guardianship, rather than adoption, to permit him to maintain his relationship with them—an option Jennifer and Victor have rejected. However, apart from the issue of regular visitation, which we need not address,[11] the evidence before the juvenile court did not compel a finding that Joseph had established a beneficial parental relationship with his children. Moreover, whatever the nature of that relationship, the court did not abuse its discretion in concluding any benefit from maintaining it was outweighed by the benefit to the children of the stability and permanence of adoption.

---

[10] The Supreme Court has granted review in *In re Caden C.,* review granted July 24, 2019, S255839, and asked the parties to brief and argue the following issues: "(1) what standard governs appellate review of the beneficial parental relationship exception to adoption; and (2) whether a showing that a parent has made progress in addressing the issues that led to dependency is necessary to meet the beneficial parental relationship exception."

[11] See footnote 7, above.

Marissa testified she and Joseph visited the children at the same time on Sundays when Joseph was not in custody. Yet, as Marissa explained, it was primarily the maternal grandmother who interacted with the children during those visits. The court's finding that Marissa did not engage in active parenting is unchallenged. And, as the court emphasized, Joseph did not present any additional evidence suggesting he occupied a greater parental role in the children's lives than did Marissa.

To be sure, as Joseph points out, a report during the initial dependency proceedings in 2014 painted a somewhat more positive picture: "[S]ometimes the children will play among themselves a lot during the visits and the parents will sit and watch the children play rather than the parents interacting with the children. However, when the parents do engage with the children they are appropriate and appear to have a loving bond with the children. The parents are attentive to the children's needs during the visits, such as taking them to the restroom when needed, providing them with lunch and bring to the visits educational games and crafts to engage the children with." More recently, when asked about adoption, the children, while stating they wanted to remain permanently with Jennifer, also indicated they wished to continue visiting with Joseph and Marissa, suggesting the existence of some level of bond among them. This limited evidence, however, falls far short of demonstrating Joseph was entitled as a matter of law to a finding he currently maintained a beneficial parental relationship with his daughters.

In contrast to the extremely weak evidence of Joseph's positive relationship with his children, the record is replete with information establishing Jennifer's care and concern for Valerie, Bella and Jolina. The determination that whatever modest

14

benefit the children would receive from continuing their relationship with Joseph was substantially outweighed by the stability and permanence that adoption by Jennifer and Victor would provide was well within the juvenile court's broad discretion.  (See *In re Breanna S.*, *supra*, 8 Cal.App.5th at p. 646; *In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 396.)

The court of appeal's decision in *In re E.T.*, *supra*, 31 Cal.App.5th 68, cited by Joseph, illustrates the difference between the type of extraordinary parental relationship that satisfies the section 366.26, subdivision (c)(1)(B)(i), exception, and the far more limited connection between Joseph and his children.  Reversing the juvenile court's termination of parental rights, the *E.T.* court explained, "Mother's efforts during the dependency showed that the children would benefit from continuing their relationship with her.  They love Mother.  She provided them comfort and affection, and she was able to ease their fear and anxiety."  (*E.T.*, at p. 76.)  Indeed, the children's services agency, although recommending adoption as the permanent plan, believed the mother should remain present in her children's lives (*ibid.*), and even the juvenile court had found the young twins involved in the case were "'very tied to their mother.'"  (*Id.* at p. 77.)  No similar findings were made, or could be made, on the record before the juvenile court here.

Joseph's final argument—that establishing a legal guardianship, rather than ordering adoption, would both provide permanence for the children and permit them continuing contact with him as their father—runs contrary to the clear legislative directive that adoption is the preferred permanent plan for children who cannot be returned to their parents.  (See § 366.26,

15

subd. (b)(1).)[12] "The Legislature has decreed, however, that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them. In decreeing adoption to be the preferred permanent plan, the Legislature recognized that, 'Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.'" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

In sum, the court did not abuse its discretion in ruling Joseph failed to establish the parent-child-relationship exception to termination of parental rights and ordering that adoption continue as the children's permanent plan.

---

[12] Section 366.26, subdivision (c)(1)(A), authorizes the juvenile court to decline to terminate parental rights and to order a permanent plan of a legal guardianship if the dependent child is living with a relative who is unable or unwilling to adopt but is willing and capable to act as the child's legal guardian when removal from the relative would be detrimental to the child's emotional well-being. The opposite situation is present here: Jennifer, Bella and Jolina's paternal aunt, is willing and capable of adopting all three children and is not open to legal guardianship as an option.

## DISPOSITION

The March 10, 2020 order terminating parental rights is affirmed.

PERLUSS, P. J.

We concur:

FEUER, J.

RICHARDSON, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.