Filed 6/11/21  In re R.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076567 |
| Plaintiff and Respondent, | (Super.Ct.No. J276102) |
| v. | OPINION |
| G.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel and David Guardado, Deputy County Counsel for Plaintiff and Respondent.

1

Defendant and appellant G.C. (mother) appeals from an order terminating her parental rights over her child R.C. She argues that the juvenile court should have instead applied the beneficial parental relationship exception and selected a "more appropriate permanent plan such as legal guardianship." We affirm.[1]

## I. BACKGROUND

The child came to the attention of plaintiff and respondent San Bernardino County Children and Family Services (CFS) in May 2018, when the child was four years old. Mother had been arrested for child endangerment and drunk driving after an incident where she reportedly forced the child to run alongside her vehicle as she drove and yelled profanities and taunts about how he ran. By the time law enforcement arrived, the child was in the back seat of the car, but was not secured properly, and mother had shoved bottles of alcohol under the child's car seat. When interviewed, the child confirmed that mother had been drinking alcohol, "'but not in the car, in the house.'" He stated that when he told mother he did not want to run anymore, she cursed and hit him in the head, causing his head to hurt. The child also said that mother had told him "'I wish you can die.'" The child's father's whereabouts were unknown.[2] Based on CFS's initial investigation, the child was detained and placed into foster care.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The child's father is not party to this appeal, so he will be discussed only as necessary for context.

2

CFS filed a dependency petition for the child, alleging as to mother that he came within section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), and (c) (serious emotional damage). At the jurisdiction stage, mother pleaded no contest to amended allegations, and the juvenile court sustained the petition as amended. Specifically, the juvenile court found that the child came within section 300, subdivisions (a) and (b) based on the finding that, "while in the care and custody of [mother], [the child] was struck on the side of the head resulting in him having pain." The juvenile court further found that the child came within section 300, subdivision (c) based on the finding that mother "used inappropriate verbiage in disciplining the minor that caused him to suffer emotionally." Reunification services were ordered for mother, with supervised visitation set at twice weekly for two hours.

At the six-month review stage, CFS reported mother had engaged in services, but that it was "still undetermined" whether she was benefitting from them. Mother had been diagnosed with an unspecified personality disorder with "[p]atterns consistent with Obsessive-Compulsive Personality Disorder, Narcissistic Personality Disorder, and to a lesser extent Histrionic Personality Disorder." Despite therapy, mother still repeatedly demonstrated a lack of "insight" and "emotionally abusive behaviors toward the child." For example, during visitation, she would "continuously" use a "monster voice" that frightened the child. Also, she tended to "fixate on a specific task" until the child "complies or throws a tantrum." She also repeatedly used gifts as bribes and discussed case matters with the child, despite instructions not to do so. The caregivers supervising

3

visitation expressed that "they constantly feel as if they are having to parent both [the child] and the mother during the visits." Mother demonstrated an inability to link her own "child like behaviors" to behavioral issues the child demonstrated in the caregiver's home, which tended to regress after visits.

CFS recommended that reunification services continue, but that the visitation take place in a therapeutic setting, rather than under the supervision of the caregivers. The juvenile court ultimately ordered mother to have visitation one time per week for four hours, supervised by CFS or in a therapeutic setting.

At the twelve-month review stage, CFS recommended that mother's services be terminated. Mother continued to demonstrate "very little insight" into the reasons for the dependency, giving different answers as to what happened for the child to be removed depending on who was asking, and "presenting at times as if she does not know why she has an open case." Moreover, she continued to "display[] emotionally abusive patterns of behavior" toward the child. The social worker observed that "mother has a fun time playing with her son" during visits, but that she "does not talk to [the child] as a mother talks to a child, but as a mother wanting to make a good impression because she is being watched." Instead of engaging with the child, she would "quote what her therapist has told her to say to her son when talking to him." A psychological evaluation reported that mother's "style of interacting with her son is controlling (in play, what emotions he can display) and her form of discipline is verbally and emotionally abusive at times." For example, mother fixated on the notion that for the child to be returned to her care, he had

4

to say "I miss you" to her. During a visit, she focused on coaching the child to say that he misses her to the point that she "inadvertently was non-compliant with the visitation rules."

After a contested 12-month status review hearing in July 2019, the juvenile court ordered mother to receive additional reunification services, including "confrontational therapy" aimed at addressing her personality disorder, as had been recommended by a previous psychologist. It further ordered mother to have supervised visitation with the child for three hours per week and one hour per week in a therapeutic setting.

At the 18-month status review stage, CFS again recommended that the juvenile court terminate mother's services and set a section 366.26 hearing.[3] Mother's family therapy with the child was terminated as unproductive after several weeks in a row when the child was "resistant to engage and requiring constant redirection." The therapist observed that mother had been "resistant at times to the suggestions provided by [the] clinician," and continued "to require redirection at times to validate [the child's] feelings." Mother began her separate "confrontational therapy" as ordered, but she ceased attending in March 2020, expressing that she was uncomfortable attending video sessions (as was necessary due to the pandemic) and that she did not feel she could make "'more changes.'"

---

[3] The initial 18-month status review hearing was held in November 2019, but the matter was set for contest and, apparently due to the pandemic, was not heard until September 2020.

CFS reported that mother's visits with the child continued to be problematic. Mother's behavior was rigid and controlling, and she sometimes used emotionally manipulative threats to get the child to behave in the manner she wanted.[4] The social worker observed that mother "is constantly dictating everything from the way he chews his food to the path he takes to the playground." She "constantly use[d] scare tactics to control [the child] such as making him say a prayer every time he steps foot on a playground so he doesn't get hurt and if he does get hurt, it is because he didn't say a prayer." "Usually the visits are [the child] saying what he wants, [mother] trying to convince him to do something else, trying to make it sound more appealing so he does want to . . . do that, and then [the child] still wanting to do what he originally wanted with mom now giving in for a limited amount of time."

When visits had to be conducted remotely due to the pandemic, mother sometimes refused to use the video conferencing application, believing that people were using it to spy on her. Mother also resisted conducting visits by phone in the required manner, trying to get the child to turn off the speakerphone and refusing to acknowledge that even remote visitation had to be supervised. During remote visits, mother would spend the "majority of the visit focusing [on] or accusing the caregiver" of things like spying on her

---

[4] For example, on one occasion when the child was not as enthusiastic to see her as she wanted, she told him "If you are not happy to visit mommy, I can leave...Mommy will just leave if you aren't excited to see her." On another occasion, mother told the child that "since mommy has been in so much stress because you are not with her, mommy's body is shutting down and I can't eat the things I used to."

or "messing with" her computer's settings. When the child did not respond to her the way she wanted, she would "end the call, yell at him[,] or change the subject."

After a contested hearing in September 2020, the court terminated mother's reunification services and set a section 366.26 hearing. Mother's visitation was reduced to twice a month for two hours.

In a November 2020 report submitted in advance of the section 366.26 hearing, CFS recommended that parental rights be terminated to free the child for adoption by his caregivers. The child had been placed with the prospective adoptive parents for two years and five months as of the time of the report. While in their care, the child had been diagnosed with and was receiving treatment for a variety of developmental and mental health challenges, including posttraumatic stress disorder. The social worker observed "a mutual attachment" between the child and the caregivers, and the child seemed to "recognize them as his parental figures." When the child was asked about adoption, he expressed that he wanted to live with his prospective adoptive parents but continue to maintain contact with his mother.[5] The social worker and the child "discussed him being able to see his mother but her having to be appropriate with him." The child "appeared to understand and accept" that answer, and "indicate[d] he did not want to be alone with [mother]."

---

[5] The caregivers who became the child's prospective adoptive parents are members of the child's extended family, and they indicated their intention to "ensure that [the child] maintains a bond with his family." They intended to be "cautious" with visits with mother, and were aware that [the child] is "not to be left alone with [mother] at any time or situation."

Mother continued to demonstrate concerning behavior in relation to the caregivers and the child, on one occasion appearing uninvited at the caregiver's parents' home, demanding to see the child (who was not there at the time). The caretakers also learned that mother had registered to vote using their address. The social worker expressed concern that such "stalking" behavior could risk the stability of the child's placement. Mother's behavior during visits continued to cause a "negative emotional effect on the child." She also would speak about the case to the child, including by "telling [him] that he is not being adopted." After visits with mother, the child would display "developmental regression," acting more like a three or four year old than a seven year old.

At the contested section 366.26 hearing in February 2021, the juvenile court ordered parental rights terminated, finding that the child was specifically adoptable and that none of the exceptions to adoption applied.

## II. DISCUSSION

Mother contends the juvenile court erred by selecting adoption as the child's permanent plan, arguing that it should instead have concluded that the beneficial parental relationship exception to adoption applied. We are not persuaded.

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for a dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53.) "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent

8

placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care." (*Id.* at p. 53.) "Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.'" (*Ibid.*)

To avoid termination of parental rights, a parent must prove one or more statutory exceptions apply. (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*).) One such exception is the beneficial parental relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i), which applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parent has the burden of proving his or her relationship with the child would outweigh the well-being gained in a permanent home with an adoptive parent. (*Anthony B.*, *supra*, at pp. 396-397.)

In determining the applicability of the beneficial parental relationship exception, the court considers ""'"[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs.""'" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) "A showing the child derives some benefit from the relationship is not sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646.) Furthermore, evidence of frequent and loving contact is not enough to establish a beneficial parental relationship. (*Ibid.*) The parent must also show he or she occupies a parental role in the child's life. (*Ibid.*) "The relationship that gives

rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

Our review of the juvenile court's ruling incorporates both the substantial evidence and abuse of discretion standards. We generally review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence. (*In re Caden C.* (May 27, 2021, S255839) __Cal.5th__ [2021 Cal. LEXIS 3522, at \*33].) Any factual determinations that underlie the juvenile court's evaluation of whether termination of the parental relationship would be detrimental to the child as weighed against the benefits of adoption are also generally reviewed for substantial evidence. (*In re Caden C.* (May 27, 2021, S255839) __Cal.5th__ [2021 Cal. LEXIS 3522, at \*34].) But where the juvenile court found the parent failed to carry his or her burden of proof, the question is more properly stated not in terms of substantial evidence, but rather "whether the [appellant parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) The juvenile court's balancing of factors relating to detriment is a discretionary decision, properly reviewed for abuse of discretion. (*In re*

*Caden C.* (May 27, 2021, S255839) __Cal.5th__ [2021 Cal. LEXIS 3522, at *35].) We will not reverse the juvenile court's order as an abuse of discretion unless the court made an arbitrary, capricious, or patently absurd decision. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

The record amply supports the juvenile court's conclusion that the beneficial parental relationship exception does not apply. Although mother regularly visited with the child, the record does not compel the conclusion that she occupies a parental role in his life. The child was four years old when he was removed from mother's care. The day-to-day parental role has now been fulfilled for years by his current caretakers, and the social worker observed that the child now looks at them as his "parental figures." Mother, meanwhile, failed to progress in reunification even to unsupervised visitation.

Furthermore, even assuming the existence of a parental relationship, we find nothing arbitrary, capricious, or absurd in the juvenile court's determination that any benefits of that relationship were outweighed by the benefits of adoption. Although mother and child sometimes had "a fun time" during visits, the child's visitation with mother was often affirmatively detrimental to him, subjecting him to what supervisors observed to be emotionally abusive behavior by mother and causing his behavior and mental health to regress afterwards. There is little if anything in the record to suggest mother might be prepared to resume custody of the child at any time in the foreseeable future. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419 ["The Legislature has decreed . . . that guardianship is not in the best interests of children who cannot be

11

returned to their parents."].)  Mother has raised no challenge to the juvenile court's finding that the child is specifically adoptable, with prospective adoptive parents who have long been his primary caretakers and who are prepared to offer him a safe and loving home on a permanent basis.  It was well within the boundaries of the juvenile court's discretion to find that any detriment from terminating mother's parental relationship with the child was outweighed by the benefits of adoption.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
J.

We concur:

RAMIREZ
P. J.
MILLER
J.

12