Filed 11/15/22  In re N.C. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B320724 (Super. Ct. No. 21JV00319) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES, Plaintiff and Respondent, v. A.C., Defendant and Appellant. | |

A.C. (Mother) appeals from the juvenile court order terminating her parental rights as to her daughter, N.C., and selecting adoption as the permanent plan.  (Welf. & Inst. Code, § 366.26.)[1]  She contends the court erred when it found

_____

[1] Subsequent undesignated statutory references are to the Welfare and Institutions Code.

inapplicable (1) the parental-benefit exception, and (2) the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father[3] exposed N.C. to violence and abusive behavior when she was six years old. Mother had untreated mental health issues. Father reported that as a result, Mother was unable to recognize N.C. as her daughter and thought she was Father's sister. Mother and Father had a long history of domestic violence and substance abuse and continued to use methamphetamine. In 2012, the parents lost custody of their two older children due to parental neglect.

The juvenile court found the petition to be true (§ 300, subds. (b)(1), (j)), declared N.C. a dependent, and bypassed reunification services for both parents (§ 361.5, subd. (b)(10), (11), (13)). N.C. was placed with her maternal grandparents, who had custody of her siblings.

At the selection and implementation hearing (§ 366.26), the juvenile court found ICWA did not apply. After hearing evidence, the court found the parental-benefit exception did not apply. (§ 366.26, subd. (c)(1)(B)(i).) The court terminated the parental rights of both parents and selected adoption as the permanent plan.

*Parental-benefit exception*

---

[2] We use ICWA to refer to both the federal statute and the California law that implements it.

[3] Father was a party in the juvenile court proceedings but is not a party in this appeal.

The juvenile court considered reports from the Department of Social Services (the department) and the court appointed special advocate (CASA), heard testimony of the social worker and both parents, and heard an unsworn statement from the CASA.

The department's report included a summary of Mother's visits with N.C. Mother visited N.C. regularly. At one visit, Mother appeared to be under the influence of marijuana and had difficulty focusing. During visits, they played together, hugged, kissed, and said "I love you." They also spoke on the phone between visits.

N.C. reported that when she lived with her parents, she was scared because they constantly fought and cussed at each other. Being adopted would make her sad because she would not be able to live with her parents or see them every day. The custodial grandparents had previously adopted and had legal guardianship over N.C.'s siblings. They wanted to adopt N.C. because she would be raised with her siblings in a safe, stable, and nurturing home. The department recommended adoption and termination of parental rights.

The CASA report stated that N.C. was doing well in school. She "mentions her parents far less frequently." She was "happy and loving and . . . adjusting remarkably well to the rules and new structure in her life."

The social worker testified N.C. originally said she did not want to be adopted but later said she did. N.C. expressed an "internal conflict" because she did not want either her parents or her grandparents to be sad. She felt safe in her grandparents' house. She loved sharing a bedroom with her older sister and continued to build her relationship with her brother. N.C.

enjoyed being together with her adoptive family and saw that as her home.

Mother testified N.C. lived with her from birth until juvenile proceedings began. As her daily caregiver, Mother fed her, changed her diapers, put her to bed, and woke her each morning. Mother and N.C. were "very close" and had an "unbreakable" connection. During visits, they were excited to see each other, ran to each other, and hugged and kissed. Mother continued to be in a relationship with Father. Father testified about his role in raising N.C. and admitted recent relapses on methamphetamine.

The CASA told the court that although N.C. "loves her parents dearly," she viewed her grandparents' home as her family home and described her future with them.

*ICWA*

When the case was initiated, both Mother and Father told the department about possible Native American heritage on their respective parental sides, but they "did not know of any tribal affiliation." In a form attached to the dependency petition, the department's social services worker stated, "This inquiry . . . gave me reason to believe the child is or may be an Indian child."

At the detention hearing, Mother said she may have Cherokee ancestry on her father's side but wasn't sure. Father said, "We do have Indian in our background, but . . . we don't belong to a tribe or anything like that, no." The court ordered the parents to submit ICWA forms. The department sent Mother an ICWA questionnaire, but she did not return it.

The department received ancestry information from several databases. The department spoke to Father a month after the detention hearing. He said N.C. did not have any relevant

ancestry because "nobody in the family has ever been registered in any tribe." He said his mother (N.C.'s paternal grandmother), D.G., was adopted and did not know her biological family. He said his father (N.C.'s paternal grandfather, who died in 1989) "was never registered in any tribe and the family doesn't know which tribe his ancestors could have been related to."

The department spoke with the maternal grandmother, P.D. She did not know if Father had any Native American ancestry. She declined to provide contact information for "the other grandmother" (D.G.) but agreed to call her for further information and call the department back. When P.D. failed to call, the department left P.D. a voicemail that was not returned.

The department spoke to the maternal step-grandfather, D.D., but there is no indication they discussed ICWA. The record does not identify the biological maternal grandfather.

Attached to the department's jurisdiction and disposition report was ICWA information from the 2011 case regarding N.C.'s siblings. At that time, the paternal grandmother, D.G., said any Native American ancestry was through her deceased husband, T.C., on his mother's side, and is "very, very remote." She said "the best way to get info" was through T.C.'s sister (minor's great aunt), I.H. The department called the number for I.H. that D.G. provided, but the phone was disconnected. The department called D.G. back and left a voicemail message that was not returned. The department also spoke in 2011 to T.C.'s mother (N.C.'s paternal great-grandmother), J.C. She said both her family and her husband's family were from Mexico and did not have Native American heritage.

In N.C.'s case, the department sent an ICWA inquiry with a family tree to the Bureau of Indian Affairs (BIA). It responded,

"The notice contains insufficient information to determine Tribal affiliation."

The section 366.26 hearing was continued at the request of the department so it could make ICWA inquiries to Cherokee tribes. The department then received a response from the Cherokee Nation stating that N.C. was not an Indian Child in relation to the Cherokee Nation, and neither she nor the parents were registered as tribal citizens. Responses from the United Keetoowah Band of Cherokee Indians and the Eastern Band of Cherokee Indians said N.C. was not eligible and was not recognized as a member. The court found ICWA did not apply.

DISCUSSION

*Parental-benefit exception*

Mother contends the juvenile court erred when it failed to apply the parental-benefit exception to bar adoption as the permanent plan. We disagree.

After reunification services have been terminated, the court sets a section 366.26 hearing "'to select and implement a permanent plan for the child.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 630.) The statutory preference is termination of parental rights and placing the child for adoption. (§ 366.26, subd. (b)(1).) The parental-benefit exception allows the court to choose an option other than adoption "'in exceptional circumstances.'" (*In re Caden C.*, at p. 631.)

The parental-benefit exception has three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i).) The parent must establish these three elements by a

6

preponderance of the evidence. (*In re Caden C.*, at p. 629.)

We review for substantial evidence the first two elements—consistent visitation and benefit from continuing the relationship. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) For the third element—detriment to the child if the relationship is terminated—we review for substantial evidence factual determinations such as "specific features of the child's relationship with the parent," "the harm that would come from losing those specific features," and "the benefit of adoption." (*Id*. at p. 640.) In so doing, we do "'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Ibid*.) We review for abuse of discretion the "delicate balancing" of "the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Ibid*.) "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"""" such that """"no judge could reasonably have made the order."""" (*Id*. at p. 641.)

The juvenile court here discussed *In re Caden C.* and applied its standards. The court was not required to make factual findings or describe the evidence that supported its decision. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) We presume the judgment is correct; Mother has the burden to affirmatively demonstrate error. (*Id*. at p. 1161.)

The first and second elements of the exception—regular visitation and benefit from continuing the relationship—were established. But "[a] showing the child derives *some benefit* from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *In re*

7

*Caden C., supra,* 11 Cal.5th at p. 637, fn. 6, italics added.) The parent bears the burden of proving that termination of parental rights would be detrimental to the child. (*Ibid.*) "Friendly or affectionate visits are not enough." (*In re G.H.* (2022) 84 Cal.App.5th 15, 25.) "'To overcome the preference for adoption and avoid termination of the natural parent's [parental] rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial,* positive emotional attachment such that the child would be *greatly* harmed." (*Id.* at p. 25.)

The juvenile court did not abuse its discretion when it determined that termination would not be detrimental to the child. At the time of the selection and implementation hearing, N.C. had been living with her grandparents for over eight months. N.C. was happy living with her grandparents and siblings and was doing well in school. The court stated, "The child sees her current home as her home. It's the very stability that we hope to offer in a permanent home for the child . . . ." The juvenile court acted within its discretion when it determined that N.C.'s best interest was served by severing parental rights to provide a safe and stable home through adoption.

Mother compares the department's report with the "inexplicably terse and analytically uninformative" bonding evaluation in *In re M.G.* (2022) 80 Cal.App.5th 836, 850. There, the trial court found the parental-benefit exception was not shown based *solely* on the bonding evaluation, which confused the relevant issue of emotional bond with the irrelevant issue of the parents' ability to manage the child's developmental and medical needs. (*Id.* at p. 851.) Here, the juvenile court's finding was based not only on the reports from the department and CASA,

but on the testimony of both parents and the social worker and the CASA's verbal statement. The thoroughness of the report is not determinative because Mother, not the department, had the burden to establish the parental-benefit exception. (*Id*. at p. 846.)

Mother testified her relationship with N.C. was "unbreakable." Father testified about his role in raising N.C. and his struggles with addiction. The social worker testified N.C. felt safe in her grandparents' house and viewed it as her home. Although N.C. previously told the social worker she did not want to be adopted, she more recently said she did. The CASA told the court that N.C. viewed her grandparents' home as her home. The CASA felt strongly it was in N.C.'s best interest to remain with the grandparents.

The trial court did not abuse its discretion when it found the social worker and the CASA more credible and determined that Mother had not met her burden to establish the parental-benefit exception to adoption.

*ICWA*

Mother contends the juvenile court erred when it found ICWA did not apply because the department failed to interview N.C.'s maternal and paternal grandparents. We disagree because the department's inquiry was reasonable.

ICWA serves "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; Welf. & Inst. Code, § 224. subds. (a) & (b).) When the facts are undisputed, we independently review compliance with ICWA. (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.) We

review the juvenile court's determination that ICWA does not apply for substantial evidence. (*In re A.M.*, at p. 314; § 224.2, subd. (i)(2).)

"'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).) Whether a child is a member or eligible for membership is conclusively determined by the tribe. (§ 224.2, subd. (h).)

The court and the department have "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child." (§ 224.2, subd. (a).) The process is divided into three phases: an initial duty to inquire in all cases, a duty of further inquiry when there is *reason to believe* the child may be a tribal member or eligible for membership, and a duty to provide formal notice when there is *reason to know* the child is a member or eligible for membership. (*In re D.F.* (2020) 55 Cal.App.5th 558, 566-567.) If the initial inquiry is deficient, that issue becomes moot once the department makes reasonable inquiry before the juvenile proceedings are concluded. (See *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638-639 & fn. 2.)

None of the circumstances constituting "reason to know" apply here: (1) "[a] person having an interest in the child . . . informs the court that the child *is* an Indian child," (2) the child, parent, or Indian custodian lives on a reservation, (3) a designated person "informs the court that it has discovered information indicating that the child *is* an Indian child," (4) "[t]he child . . . gives the court reason to know that the child is an Indian child," (5) the child has been a ward of a tribal court, or (6)

the parent or child has a tribal membership identification card. (§ 224.2, subd. (d), italics added.)

The department initially stated there was *reason to believe* N.C. might be an Indian child. This determination was based on "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) As detailed below, the department made "further inquiry" into N.C.'s status "as soon as practicable," including interviewing extended family members,[4] contacting the BIA, and contacting tribes and other persons who might have information. (§ 224.2, subd. (e); Cal. Rules of Court, rule 5.481(a)(4).)

The law does not require the department to contact every extended family member including every aunt, uncle, and first and second cousin. (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1006-1007.) All that is required is a *reasonable* inquiry. (*In re J.K.* (2022) 83 Cal.App.5th 498, 508, fn. 7.) Other than the parents, the maternal and paternal grandmothers, and the paternal great-grandmother, the record does not show that extended family members were "readily available" to the department. (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 682; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 403.)

The department made a reasonable inquiry here. The department interviewed Mother, Father, and the maternal grandmother. All had only vague information about possible Native American ancestors. The maternal grandmother would

---

[4] "'[E]xtended family member'" is defined as the "child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c); 25 U.S.C. § 1903(2).)

11

not provide contact information for the paternal grandmother and did not return a call to determine if she had contacted her. But in 2011, the paternal grandmother said any Native American ancestry was through her deceased husband and was "very, very remote." The department could not contact the paternal grandfather because he died in 1989. The record contains no information whether the identity of the biological maternal grandfather was known.

The paternal great-grandmother, great aunt, and maternal step-grandfather all fall outside the definition of "extended family member." Nevertheless, the department spoke to the paternal great-grandmother in 2011, who said her family and her husband's family were from Mexico and did not have Native American heritage. The department attempted to contact N.C.'s great aunt in 2011 but the phone was disconnected. In addition to interviewing several relatives, the department also contacted the BIA and the Cherokee bands, who stated N.C. was not a member and not eligible for membership.

Mother has not shown the existence of "any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).) Following the department's ""proper and adequate further inquiry and due diligence"" (*In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 408), the court properly concluded that ICWA did not apply.

Mother also contends the department failed to file required documents. "The petitioner must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how

and when this information was provided to the relevant tribes." (Cal. Rules of Court, rule 5.481(a)(5).) The department's reports described its ICWA inquiries. Mother has not shown the information was incomplete. The department was not required to file copies of the actual inquires because there was no "reason to know" N.C. was an Indian Child. (§ 224.3, subds. (a), (b), (c); 25 C.F.R. § 23.111(a) (2021); *In re J.C.* (2022) 77 Cal.App.5th 70, 78.)

In summary, because Mother has not shown the department or the juvenile court failed to comply with their duties to inquire into Indian heritage, the court properly concluded that ICWA did not apply.

DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED.</u>

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

_____

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Rachel Van Mullem, County Counsel, Lisa A. Rothstein, Deputy County Counsel, for Plaintiff and Respondent.