Filed 2/13/24 In re N.M. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re N.M. et al., Persons Coming Under the Juvenile Court Law. | B326368 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No.18CCJP00713A, B) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jennifer W. Baronoff, Juvenile Court Referee. Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

Jose M. (Father) challenges the juvenile court's order terminating his parental rights to his son N.M. and his daughter A.M. pursuant to Welfare and Institutions Code section 366.26.[1] He contends the juvenile court erred when it found he had not established the beneficial parent-child relationship exception to the termination of parental rights. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

N.M. was born in 2013, and A.M. was born in late 2017.

In 2016, prior to A.M.'s birth, N.M. was declared a dependent child of the juvenile court based on sustained allegations, pursuant to section 300, subdivisions (a) and (b)(1), that Father engaged in domestic violence against Brenda G. (Mother) in N.M.'s presence and Mother failed to protect N.M. from Father's violent conduct. In 2017, the juvenile court granted Mother sole legal and physical custody of N.M. and terminated juvenile court jurisdiction. Father was granted monitored visitation at least once per month.

In January 2018, the family came to the attention of the Department of Children and Family Services (DCFS) based on another report of domestic violence by Father against Mother. While interacting with DCFS, Mother exhibited paranoid behavior and suicidal thoughts. DCFS detained the children on January 30, 2018, and filed a dependency petition on February 1, 2018. In May 2018, the children were declared dependents of the juvenile court pursuant to section 300, subdivision (b)(1), based on the sustained allegation that Mother had mental and emotional problems, which, if left untreated, rendered her unable

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

to provide regular care to the children.  The court removed the children from both parents.  The parents were granted reunification services and monitored visitation.

Later in 2018, DCFS filed another dependency petition pursuant to section 342, and the juvenile court sustained three additional allegations of domestic violence and alcohol abuse by Father.  At disposition, the court removed the children from the parents, ordered reunification services, and granted monitored visitation.

I.     Detention Through the First Reunification Period: May–November 2018

From February 2, 2018, when monitored visitation was first ordered, through August 15, 2018, Father's visitation was sporadic.  The caregiver attributed this to the geographic distance of the placement and Father's work schedule.

On March 3, 2018, Father was one and one-half hours late to his visit.

As of May 2018, the children's caregiver reported Father visited on weekends but missed some weekends because of work.  One visit was aborted because Father was hostile and appeared to have been drinking.

In July 2018, DCFS documented that Father had not been visiting the children due to his work schedule.

Starting August 15, 2018, when the children were placed in foster care, Father's visitation became more consistent.  Between mid-August and mid-October 2018, Father attended all of his monitored visits and arrived on time.  Father visited the children once per week for four hours due to his work schedule.

At the six-month review hearing in November 2018, the court ordered six more months of reunification services and gave DCFS discretion to liberalize visitation.

## II.    Second Reunification Period: November 2018–August 2019

Through April 2019, Father visited the children every Sunday and telephoned them daily.

As of early August 2019, Father was reported to visit the children approximately twice per week and telephone them two to three times per week.  ~(CT 727)~  However, in September 2019, Father was reported to have visited or contacted the children 12 times in the prior six months.

## III.    Post-Reunification Period: August 2019–January 2022

### A.    *Remainder of 2019*

On August 8, 2019, the juvenile court terminated reunification services for both parents.

Father visited the children on October 3, 2019.  His October 9, 2019 visit was canceled because he failed to confirm it in advance.

Father did not appear for his visit with the children on October 17, 2019.  The October 24, 2019 visit was canceled due to a closed highway.

As of late October 2019, DCFS reported Father tended to call the children between 8:00 and 9:00 p.m., after their 7:30 p.m. bedtime.

On November 21, 2019, Father was scheduled to visit the children from 4:00 p.m. to 5:30 p.m.  He arrived at 4:26 p.m. and left at 5:00 p.m., saying he had to go to a class.

4

B.    *2020*

As of January 2020, DCFS described Father's visitation as consistent and reported he visited the children for 90 minutes at a time, two to three times per month.  Father was unable to visit more frequently due to his work.  Father telephoned the children almost daily, but he frequently called after they had gone to bed.  Father attributed his late calls to work and classes.

In approximately January 2020, Father's visits were moved from weekdays to Saturdays and increased to three hours.

On April 29, 2020, during the COVID-19 pandemic, Father agreed to video visits on Saturdays and Sundays, for a duration appropriate for the children's attention spans.  Additionally, Father and the caregiver arranged for him to have weekday monitored video visits with the children from 11:00 a.m. to 7:00 p.m., once N.M. finished his online education and as Father's work schedule permitted.

As of July 2020, DCFS reported Father had been "very sporadic and non-compliant with the visitation plan," and by January 2021 DCFS reported he had "never followed the visitation schedule."  Father had video or telephone calls with the children on May 12, 16, 20, 26, and 31; June 7; July 2; August 10, 25, and 30; September 1, 2020.[2]

Father visited the children in person on October 17, 24, and 31, and November 14 and 21, 2020.  The visits were two hours long, although Father was 30 minutes late to two visits.

---

[2]    Father attempted to call the children on two additional occasions, but he did not speak with them because he called after the specified hours.

5

Father visited the children via video call four times in November 2020 and five times in December 2020.

C.   *2021*

Father had video visits with the children on January 5 and 11, 2021.

Father had a monitored visit with the children on February 19, 2021; he arrived 15 minutes late.  Father failed to appear for his visit on February 26, 2021.

Father visited the children on March 5 and 19. 2021.  His March 12, 2021 visit was canceled when he failed to confirm the visit in advance.

In March 2021, Father was advised visits could no longer take place on weekdays because N.M.'s school objected to N.M. missing school time.  Father said he often worked Saturday mornings but would visit on Saturday afternoons.

Father visited with the children on April 2, 2021.  He requested a visit on Sunday, April 18, 2021, so N.M. could have his hair cut.[3]  Father said the hair appointment was at 11:00 a.m., but he did not arrive at the barbershop until 11:15 a.m. When Father learned N.M. could not be seen until 1:00 p.m., Father said he had other things to do, handed the caregiver money for the haircut, gave the children some gifts, and left. Father spent only 20 to 30 minutes with the children.

---

[3]   One list of visit dates in the record omits the April 18 visit and indicates a visit on April 19, 2021.  It appears this may be a typographical error in referring to the April 18 visit.

Father visited the children on April 25, 2021, for 90 minutes. On May 2, 2021, Father arrived nearly half an hour late for the one-hour visit he requested. The caregiver allowed the visit to run nearly an hour over the scheduled end time.

Father visited the children on May 9, 16, 23, and 30, 2021, and on June 6, 2021. Father was half an hour late to the June 6, 2021 visit.

In July 2021, Father was late to two visits and did not appear for a third visit. He declined another visit offered by the caregiver, saying he was too busy with work.

Father had no full visits in August or September 2021. He ended his visit an hour early on August 1, 2021, due to work. He was late on August 8, 2021, and on August 15, 2021, he was late to the visit and then ended it early. He was late on August 22, 2021, and he missed his visit on August 29, 2021. On September 5, 2021, Father arrived half an hour late and wanted to leave after half an hour, although the monitor was able to encourage him to stay for an additional 20 minutes. He was a no-show for his September 12 visit and was late to his September 19 and 26, 2021 visits.

Of five scheduled visits in October 2021, Father arrived late for three visits and failed to appear for two. He did not appear for his visit on November 7, 2021. Father visited with the children for a bonding study on November 13, 2021, and he then chose not to visit them the following day.

On November 21, 2021, Father made a hair appointment for N.M. at 9:00 a.m., for a 9:00 to 11:00 a.m. visit. ~(CT 1633)~ Father called the caregiver and said he had run out of gas. Although the caregiver took Father gasoline at about 9:10 a.m. and returned to the barbershop at approximately 9:20 a.m.,

Father did not arrive at the barbershop until 9:50 a.m. N.M. said he did not want a haircut, and Father ended the visit at approximately 10:15 a.m.

The caregiver told Father he could visit the children any time during the week of Thanksgiving break, but Father said he could not visit them. He visited the children on November 28, 2021, but he arrived late and left early.

DCFS reported in November 2021 that although the date, time, and location of the visits were selected by Father, the visits that did occur were usually brief: Father was in a hurry and spent only about an hour playing with the children.

As of December 2021, the caregiver reported Father was regularly 20 to 30 minutes late for his two-hour visits and then ended them 45 minutes early; and he also canceled visits at the last minute. Father canceled his December 5, 2021 visit while the children were already waiting for him; he said he was ill. On December 12, 2021, he was late to the visit and left after less than an hour. He again arrived late and left early at the December 19, 2021 visit. The children and caregiver were sick and could not attend the December 26, 2021 visit; Father was offered a video visit but he did not contact the children. Father was also offered additional visits with the children during their school break, but he responded, "[W]e'll see."

As of December 2021, Father had not called the children for six or seven months.

IV.    Third Reunification Period: January–July 2022

On January 4, 2022, the juvenile court partially granted Father's section 388 petition, awarding him six additional months of family reunification services and a minimum of three three-hour monitored visits per week. Father's written visitation

schedule provided for monitored visits with the children on Saturdays and Sundays from 9:00 a.m. to 3:00 p.m. Father chose to visit on Sundays from 10:00 a.m. to 2:00 p.m.

Over the review period, Father attended seven visits and missed 11 or 12. On January 16, 2022, Father was scheduled for a visit, but although the monitor and the children appeared, the visit did not take place due to confusion over the visit time and location. Father visited the children three times in February, twice in March, and twice in April 2022. He missed one visit in February, two visits in March, two visits in April, all four of his May visits, and both of his June visits.[4] As of the writing of DCFS's status report in mid-June 2022, Father had not seen the children in more than two months.

Father's brother monitored all of Father's visits during this period. DCFS suggested Father choose a neutral monitor in addition to family members, and Father indicated he would contact the evaluator who had performed the bonding study. In May 2022, Father told DCFS his family was unable to monitor visits and he would like the caregiver to monitor his visits. The social worker reminded Father that he and his attorney did not want the caregiver to monitor visits, and Father said, "Oh yeah[,] that's right." The social worker offered to monitor visits and suggested Father let the social worker know when he had an opening in his day schedule because the children would soon be on summer break and potentially could visit Father on weekdays. Father said he would let the social worker know.

---

[4]     Father attributed his March 20, 2022 absence to work and his March 27, 2022 absence to illness.

On July 12, 2022, the trial court terminated Father's reunification services.

V.    Post-Reunification Period: July–December 2022

As of November 2022, DCFS reported it had provided Father with times he could contact the children from 8:30 a.m. to 6:30 p.m., but Father did not adhere to the schedule and had only had brief video and telephone calls with the children on a few occasions.

In August 2022, DCFS offered Father a referral to an organization that might be able to provide a monitor for visits, but Father said he would obtain a monitor from the agency where he was receiving counseling services.

DCFS applied to neighborhood monitored visitation centers for Father's visits with N.M. and A.M. and Father's third child, also a dependent child.  The first visit was to take place on October 8, 2022, but the mother of Father's third child canceled that visit and the following visit, scheduled for October 15, 2022. The caregiver offered to bring N.M. and A.M. to visit Father on October 15 so that he could at least see two of his children, but Father declined and chose to go to work instead.

Father visited the children on October 29, 2022, and November 5, 2022, but he then missed his next three visits, causing the visitation center to terminate his services for non-compliance.

The section 366.26 hearing took place on December 22, 2022.  Relying heavily on a positive November 2021 bonding study, Father argued the beneficial parental relationship exception to the termination of parental rights applied.  The juvenile court found Father had failed to establish he had

10

maintained regular visitation with the children. The court terminated parental rights. Father appeals.

## DISCUSSION

<u>Applicable Law</u>

At a section 366.26 permanency planning hearing, the court determines by clear and convincing evidence whether the child is likely to be adopted. If the court so finds, the court is statutorily required to terminate parental rights unless there is a compelling reason to find that termination of parental rights would be detrimental under one of the six exceptions enumerated in section 366.26, subdivision (c)(1)(B). (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206–207). One of the exceptions is the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i), which applies when a parent has maintained regular visitation and contact, the child would benefit from continuing the relationship, and terminating the relationship would be detrimental to the child. (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

Three elements must be satisfied to establish the beneficial parental relationship exception: 1) regular visitation and contact, taking into account the extent of visitation permitted; 2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate

11

parental rights.  In that case the court must select a permanent plan other than adoption.  (*Id*. at pp. 636–637.)

The parent has the burden to show the statutory exception applies.  (*In re Derek W*. (1999) 73 Cal.App.4th 823, 826.)  When a party with the burden of proof does not carry that burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*In re I.W*. (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B*. (2020) 9 Cal.5th 989, 1010, fn. 7.)

Because the court concluded Father failed to prove the exception applied, we determine on appeal whether the evidence compels a finding in his favor as a matter of law.  (*In re I.W*., *supra*, 180 Cal.App.4th at p. 1528.)  Father has failed to show that the evidence, taken as a whole, compelled a finding in his favor.  Father's visitation consistency varied over the 4 years 10 months the children were removed from his custody prior to the termination of parental rights.  Initially in 2018, Father visited the children only sporadically, but when their placement changed in August 2018, he began visiting the children consistently once per week.  For approximately one year, Father maintained close contact with the children, visiting regularly, telephoning them daily, and conducting video calls with them when the caregiver was available.

12

Once reunification services were terminated for the first time in August 2019, Father began missing or cutting short some visits. Still, as of January 2020, DCFS considered his visitation consistent and reported he visited the children two to three times per month for 90 minutes at a time. Father continued to telephone the children almost daily, but often they had already gone to bed.

Father's visits during the COVID-19 pandemic became sporadic again. He was scheduled for video visits on both weekend days, as well as weekday video visits after N.M.'s online school, but he did not comply with the visitation plan. From May 2020 through December 2020, Father had 20 video visits with the children and saw them in person five times; he was late to two of the five in-person visits.

In 2021, Father appeared on time and stayed for his entire scheduled visit with the children approximately 11 times. He missed or canceled at least nine visits. He arrived late, left early, or both, at approximately 20 visits. Father declined opportunities to visit with the children four times. As of December 2021, he had not telephoned the children for six or seven months.

When Father's reunification services were reinstated in January 2022, he was afforded monitored visits with the children on Saturdays and Sundays from 9:00 a.m. to 3:00 p.m., and he chose to visit on Sundays from 10:00 a.m. to 2:00 p.m. During this final reunification service period at the start of 2022, Father missed 11 or 12 visits and attended seven.

After Father's reunification services were again terminated in July 2022, his contact with the children declined further. Father only had brief video and telephone calls with them on a few occasions. He declined a mid-October visit. He visited the children twice, but then missed his next three visits, prompting the visitation center to terminate his services for noncompliance.

From the record before us, it appears Father visited sporadically at the start of the case, was in regular and consistent contact with the children for a period of the dependency proceedings, but then became erratic in his visitation, culminating in a near-total complete loss of contact in the months leading up to the termination of his rights. As of December 2022, Father had visited the children only twice in the past seven months, and he had called them only rarely. We cannot say the evidence of Father's visitation compels a finding that he regularly visited N.M. and A.M.

Father contends the juvenile court "erred by limiting its consideration of [Father's] visitation with his children to the year 2022," and he claims the court only considered two 2022 documents in reviewing his visitation history. Our review of the hearing transcript does not support these assertions. At the termination of parental rights hearing, the court admitted into evidence 20 different DCFS reports dating back to 2019, and the earliest report chronicled Father's visitation back to the children's initial months in their first placement. The full history of Father's visitation, therefore, was before the court, and it specifically stated it had considered all the evidence.

14

At the December 2022 hearing, Father's argument against the termination of parental rights was based almost exclusively on the November 2021 bonding study. Not surprisingly, therefore, the court began its ruling by acknowledging, "[W]e do have a very positive bonding study." The court, however, noted the bonding study was already more than a year out of date. Appropriately, the court did not consider the bonding study to be the last word, saying, "So I have to look at what has happened since the bonding study." The court then described the record of Father's highly inconsistent, declining visitation in the year after the bonding study, all the way through Father's loss of visitation monitoring services because he had canceled too many visits. The court concluded Father had not demonstrated he maintained regular visitation and contact.

Although Father argues the court's lack of reference to evidence from earlier in the case equates to a lack of consideration of that evidence, we understand the court's comments to indicate its recognition that despite Father's periods of consistency in visitation in the early years of the out-of-home placement and the glowing bonding study, the evidence indicated circumstances had dramatically changed in the prior year. No discussion of prior visitation is necessary to make this point. Visitation over the course of the dependency must be sufficiently consistent to be characterized as "regular" as required by the statute. (§ 366.26, subd. (c)(1)(B)(i).) After at least a year of extremely inconsistent and decreasing visitation, we cannot say that as a matter of law the record compelled a finding that Father maintained regular visitation and contact with N.M. and A.M., taking into account the extent of visits permitted. (See *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 [sporadic visits in

the first 18 months of the dependency proceedings, coupled with more regular visits during the final six months before the section 366.26 hearing, were not sufficient to show regular visitation], disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at pp. 637–639, fns. 6 & 7; *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1070–1071 [father failed to show regular visitation where his visitation "throughout the years-long dependency proceeding was sporadic and also entailed significant gaps"].)[5]

We need not address Father's argument the juvenile court erred in analyzing the other factors of the beneficial parental relationship exception.  (See *In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1068 [court need not address arguments regarding the second and third elements of the exception if the parent fails to prove the first element].)

---

[5]     Father also asserts the court "incorrectly found that [he] 'was afforded visits each Saturday and Sunday . . . [But] [h]e elected for Sunday[]s,' " and that this finding "completely ignores the evidence presented throughout the case that [Father] worked on Saturdays."  The court made no such finding: it actually stated that a report submitted by DCFS said that Father was afforded six-hour visits on both Saturdays and Sundays but elected four-hour visits on Sundays.  This description of the report was accurate.  Moreover, while there was evidence in the record that Father worked on Saturdays, there was also evidence he arranged and conducted Saturday visits.

16

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                    STRATTON, P. J.


We concur:



GRIMES, J.



WILEY, J.