Filed 5/5/26  In re G.D. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re G.D., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.R.,<br><br>    Defendant and Appellant. | G066302<br><br>(Super. Ct. No. 22DP1658)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Adrianne Marshack, Judge. Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*         \*         \*

M.R. (Mother) is the mother of G.D., who was taken into protective custody in December 2022 at the age of four. Mother appeals from the juvenile court's order terminating her parental rights. She contends the juvenile court erred by finding the parental benefit exception of Welfare and Institutions Code section 366.26, subdivision (c)(1)[1] did not apply. We conclude the court did not err by declining to apply the parental benefit exception and therefore affirm.

## FACTS AND PROCEDURAL HISTORY

### I. Detention

In December 2022, police officers found G.D. standing on the front passenger seat of a U-Haul van that Mother had been driving erratically. Inside the van were moldy food, dog urine, and feces, and methamphetamine was found within G.D.'s reach. G.D. was not wearing underpants and had dried feces and a rash on her bottom. G.D. was immediately taken into protective custody and Mother was arrested. At that time, G.D.'s presumed father (Father) was in a substance abuse treatment facility.

Two days after G.D. was taken into protective custody, Orange County Social Services Agency (SSA) filed a juvenile dependency petition asserting jurisdiction under subdivisions (b)(1), (g), and (j) of section 300. The petition alleged the circumstances under which G.D. had been detained, Mother's and Father's history of substance abuse, Mother's failure to ensure that G.D.'s basic needs for hygiene and shelter had been met, and a prior dependency proceeding involving G.D.

---

[1] Code references are to Welfare and Institutions Code.

2

At the detention hearing, the juvenile court ordered that G.D. be removed from the custody of both Mother and Father. Both Mother and Father[2] denied the allegations of the petition. G.D. was placed with a maternal great aunt (B.C.), and Mother was authorized to have six hours per week of supervised visitation with G.D.

## II. Jurisdiction/Disposition Report

SSA's jurisdiction/disposition reported, dated January 13, 2023, recommended that the court sustain the petition and declare G.D. to be a dependent child. SSA reported that Mother did not appear for her one scheduled visit with G.D., which was on January 4, 2023. G.D. was doing well and liked living with B.C., but did not want to see Mother because Mother "was being mean to her." Attempts to contact Mother had been unsuccessful. Mother's progress in alleviating or mitigating the causes necessitating court involvement were describe as "none."

The caregiver requested that G.D. be removed from her care because the caregiver felt she could no longer manage her. On March 16, 2023, G.D. was placed in the care of a maternal cousin, B.A., in Kern County. Although G.D. occasionally had minor tantrums, she felt safe and comfortable with B.A. and got along with B.A.'s daughter.

Mother was arrested on March 17, 2023 and was incarcerated from that date until her release on December 19, 2023. While incarcerated, Mother regularly visited G.D. by telephone. Sometimes G.D. did not want to speak to Mother or pushed the telephone away. B.A. reported that Mother and maternal grandmother were telling G.D. they would pick her up soon and the Mother promised G.D. that Mother would soon be back with her.

---

[2] Father is not a party this appeal.

Mother had been ordered to participate in counseling, a domestic violence program, a 12-step program, substance abuse testing and outpatient treatment. While in custody, Mother was able to participate in those programs available to her.

### III. Jurisdictional Hearing

The jurisdictional hearing was conducted on July 6, 2023. The juvenile court amended the petition by interlineation to strike the counts regarding domestic violence, mother's lack of housing, mother's criminal history, and to change some of the language of the b-1, b-2, b-3, and b-8 counts. As amended, the court sustained the petition. The court declared G.D. to be a dependent child of the juvenile court, removed her from parental custody, and ordered reunification services for both Mother and Father. Mother was authorized to have eight hours of supervised visitation with G.D. when Mother was not incarcerated, and weekly video calls while she was incarcerated.

On July 26, 2023, G.D. was placed with her maternal great aunt (B.F.) and maternal great uncle (T.S.) In September 2023, B.F. and T.S. reported that G.D. was doing well and was happy, active, and playful. Sometimes, however, G.D. would break down and cry when something did not go her way and would twist her hair, causing bald spots on the back of her head. Starting in October, 2023, G.D. attended weekly individual counseling from a school counselor, who described G.D. as "extremely bright and also very artistic."

Mother reported that during the latter part of 2023 she called G.D. daily, and G.D. would ask when she would be coming home. B.F. reported that G.D. sometimes did not want to speak with Mother and it was difficult to engage G.D. in the telephone visits. The assigned social worker

had seen G.D. "happily" pointing at pictures of Mother and that G.D. had stated "she would like to give her mother a heart because she loves her and misses her but that soon her mother will come home."

### IV. December 2023 Through June 2024

On December 20, 2023, the day after her release from custody, Mother had her first in-person visit with G.D. since being taken into protective custody. The meeting went well. G.D. hugged Mother immediately, began to cry, and told her "'I missed you, I love you.'" At one point, G.D. told Mother, "'I really want to go home, but we can tell auntie [B.F.] if you can come home with us, I love you mommy.'" During the rest of the visit, which was about one and one half hours, Mother and Child were "engaged."

The 12-month review hearing was conducted on January 4, 2024. The juvenile court found that SSA had provided Mother and Father with reasonable reunification services and that Mother's progress toward alleviating or mitigating causes necessitating G.D.'s placement had been moderate. The court ordered SSA to continue providing Mother and Father with reunification services.

Upon her release from custody, Mother enrolled in a residential substance abuse rehabilitation center for women called Prototypes. Mother left Prototypes on January 20, 2024.[3]

The social worker conducted a three-way call with Mother and B.F. on January 31, 2024 to establish a visitation plan. In February and March 2024, the social worker tried to contact Mother to arrange visitation

_____

[3] According to the Interim Review Report dated April 10, 2024, B.F. informed the social worker that Mother had had a total of two visits with G.D. while Mother was at Prototypes. One visit appears to have been the one on December 20, 2023, but the record provides no information on the second visit. Mother was allowed eight hours per week of visitation with G.D.

but Mother did not respond to the social worker's text messages. The social worker was able to speak with Mother on April 1, 2024, and an in–person visit with G.D. was scheduled for April 4, 2024. That visit, which lasted one hour, went well. G.D. was excited upon seeing Mother, who behaved appropriately throughout the visit, and Mother and G.D. engaged in age–appropriate activities.

Mother was arrested again on April 12, 2024 and was released from custody on May 9, 2024. Mother telephoned G.D. every day from jail. Sometimes G.D. was sleeping when Mother called, sometimes G.D. did not want to talk, and sometimes that call lasted only 10 to 15 minutes.

After Mother was released from jail, she did not contact the social worker to arrange visits with G.D. As of June 24, 2024, Mother's whereabouts since her release from jail were unknown.

Until September 2024, G.D. remained placed with B.F. She was doing well in this placement, and enjoyed having her own room in B.F.'s new home. SSA reported that G.D. "does not appear to be in any emotional distress without the presence or communication of the [M]other or [F]ather."

At the 18-month review hearing on June 24, 2024, the juvenile court found that Mother had made "minimal" progress toward alleviating or mitigating the causes necessitating placement. The court adopted SSA's recommendation of terminating Mother's reunification services.

**V. G.D.'s Placement With Paternal Grandmother**

In September 2024, G.D. started a 60-day trial visit with Father. She was moved out of the home of B.F. and T.S. and went to live with Father and the paternal great-grandmother, M.H., at M.H.'s home In November

6

2024, the trial visit failed and Father moved out of the home.[4] G.D. remained placed in the home of M.H., who had established a strong relationship with G.D. M.H. expressed willingness to adopt G.D., who seemed to be comfortable and secure in M.H.'s care.

As of February 5, 2025, Mother's whereabouts were still unknown. Mother had not contacted SSA or G.D. since Mother was released from custody on May 9, 2024, and SSA's attempts to contact Mother had been unsuccessful.

G.D. was doing well in M.H.'s care. In a Status Review Report dated December 19, 2024, SSA reported: "The child appears to be developing at an age-appropriate level. The child presents as energetic, sweet, kind, and playful. The child is creative and enjoys doing arts and crafts. The caregiver reports the child can engage in arts and crafts for hours. The child enjoys pretend playing with her doll house and barbies. The child has made progress with potty training and the caregiver continues to remind her to use the bathroom to decrease her accidents. During monthly compliances, the child appears comfortable and happy under the care of the caregiver." An addendum report dated February 5, 2025 reported that G.D. was "happy and comfortable" in the care of M.H. and had a close relationship with her. The report also related Father's comments to the assigned social worker that M.H. and G.D. loved each and were very close, and that M.H. could provide G.D. a stable and loving home.

The assigned social worker was able to speak with Mother on February 5, 2025. After hearing from M.H. that G.D. would be available for a visit on February 15, 2025, the social worker left voicemail and text messages

[4] Father's reunification services ultimately were terminated on March 3, 2025.

for and sent an e-mail message to Mother in order to schedule a visit. Mother did not respond.

Meanwhile, Mother's counsel brought a petition under section 388 requesting reinstatement of Mother's reunification services. The juvenile court denied the petition.

### VI. Resumption of Visits With Mother

In March 2025, Mother began a schedule of eight hours per week of visits with G.D. supervised by maternal grandfather. Because Mother had not visited G.D. in person since April 4, 2024, a virtual visit was conducted on March 5, 2025 before in-person visits commenced. At the virtual visit, G.D. asked Mother, "'[w]here have you been all this time?'" G.D. was excited during the visit and agreed to see Mother in person.

Mother's had in-person visits with G.D. starting on March 6, 2025. The visits overall went well. When the social worker asked how the visits were going, G.D. replied, "[g]ood. We shop, she buys me toys, we eat pancakes, and we play." On another occasion, G.D. said that when she was with Mother she felt "[h]appy because I really want to live with her again." At the end of visits, Mother and G.D. would hug and exchange goodbyes. M.H. reported that G.D. loved Mother, looked forward to her visits, and wanted to live with her.

Mother missed, canceled, or was late to many visits and was inconsistent in having virtual visits with G.D. The late and canceled visits made G.D. feel sad. G.D.'s therapist believed Mother not showing up at visits or arriving late "really devastate[d]" G.D., who told the therapist, "'I thought I should be number one and not the boyfriend.'" In September 2025, the therapist reported, "it is the inconsistency of mom's visitation due to mom's

cancellations that is difficult for [G.D.] to understand. It gives her false hope. She is very vocal about it if you ask her.'"

G.D. had been doing well in school, but in March 2025, when visits with Mother resumed, her behavior changed. She would cry and yell, and avoid or rip up assignments. She appeared to be "shutting down"—she did not tell anyone what was going on and would lie face down on the floor and say, "I don't know." M.H. noticed that since visits resumed there had been a regression in G.D.'s behavior and G.D. had started to use vulgar and disrespectful language.

SSA reports noted that the positive aspects of visits with Mother were "overshadowed by her frequent absences and repeated tardiness, including several no-show's that have deeply impacted the child emotionally." G.D. "growing disappointment" was "evident and concerning" and "[r]eports from the caregiver and school staff indicate that since the onset of visitation with the mother, [G.D.] has shown behavioral regression." Mother's unreliability exacerbated G.D.'s lack of emotional stability.

### VII. G.D's Attitude Toward Placement

In a Section 366.26 report dated June 30, 2025, SSA recommended termination of parental rights with adoption as the permanent plan. That recommendation was the same in an addendum report dated August 13, 2025 and an addendum report dated September 17, 2025. As to G.D.'s placement, the June 30 report notes: "[G.D.] continues to reside with her prospective adoptive parent [M.H.] who is dedicated to [G.D.]'s care and well-being and is committed to providing permanency for [G.D.] in the form of adoption. [M.H.] has been observed to be able to meet [G.D.]'s medical, dental, emotional, and developmental needs on a consistent basis and has

9

demonstrated a strong commitment to [G.D.]. [G.D.] appears comfortable in her presence and seeks out [M.H.] for comfort and to meet her basic needs."

In June 2025, G.D. expressed an understanding of what adoption meant. She loved Mother but "want[ed] a new mommy" and wanted to be adopted by M.H. G.D. said "'I love my grandma and love living with her.'" G.D. said she would "'[f]eel great'" if she was able to live until adulthood with M.H., whom G.D. felt was her "actual mom." In July 2025, when asked again about how she felt about adoption, G.D. said, "'I feel great but I really want to live with my mom.'" Mother had told G.D. that if M.H. adopted her, she could not live with Mother. G.D. told the social worker, "'I can't pick a side, I'm not ready to.'"

On September 10, 2025, G.D. told the social worker "I don't want to get adopted because I want to go live with my mama. If I get adopted, I have to live here forever." When the social worker asked G.D. if Mother talked to her about the case, G.D. replied: "[Mother] is telling me what to say to the judge. She is telling me to say I want to live with my mom." G.D. then added, "But I actually do. I can wait a really long time for my mom to finish her homework so I can go live with her."

## VIII. The Section 366.26 Hearing and Termination of Parental Rights

The section 366.26 hearing commenced on September 17, 2025 and was conducted over four nonconsecutive days ending on October 17, 2025. SSA reports dated January 13, February 27, March 29, June 1, June 26, July 5, and October 4, 2023; January 4, April 10, June 24, and December 19, 2024; and March 3, June 30, August 13, and September 17, 2025 were admitted into evidence. G.D., Mother and Maternal Grandfather (B.R.)

testified. Their testimony will be addressed, if and when relevant, in the Discussion section.

At the end of the hearing, the juvenile found that G.D. was both generally and specifically adoptable, adoption was the appropriate permanent plan, and the parental benefit exception did not apply. The court ordered parental rights to be terminated as to both Mother and Father with adoption as the permanent plan.

The juvenile court issued an 11-page statement of decision on the parental benefit exception. The court found that Mother did not have regular and consistent visitation with G.D. and, although G.D. had "a substantial, positive, emotional attachment to" Mother, the benefits of adoption outweighed any detriment caused by severing that attachment.

## DISCUSSION

### I. Elements of the Parental Benefit Exception and Standards of Review.

At a section 366.26 hearing, the court must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under a specified statutory exception. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).) One such exception is the parental benefit exception of section 366.26(c)(1)(B)(i). It applies when "the parent has maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of that relationship would impose a detriment on the child." (*Caden C.*, at p. 625.) To establish this exception, the parent must prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of

11

parental rights would be *detrimental* to the child." (*Id.* at p. 631.) "The burden is on the parent asserting the parental [benefit] exception to produce evidence establishing that exception." (*In re A.G.* (2020) 58 Cal.App.5th 973, 996.)

"What this means is that the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption." (*Caden C., supra*, 11 Cal.5th at pp. 636-637.)

The first two elements of the parental benefit exception are subject to the substantial evidence standard of review. (*Caden C., supra*, 11 Cal.5th at p. 639.) "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [Citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Id.* at pp. 639-640.)

12

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C., supra*, 11 Cal.5th at p. 640.)

"Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 640.)

## II. The Juvenile Court Did Not Err by Finding the Parental Benefit Exception to Be Inapplicable

### A. *Element One: Regular Visitation and Contact*

In assessing the first element—regular visitation and contact—the question is "whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C., supra*, 11 Cal.5th at p. 632.) This assessment is "'"qualitative and relatively straightforward, asking whether visitation occurred regularly and often."'" (*In re I.E.* (2023) 91 Cal.App.5th 683, 691.) "'Sporadic visitation is insufficient."'" (*Ibid.*)

In its statement of decision, the juvenile court thoroughly and accurately reviewed Mother's history of communicating with and visiting G.D. The juvenile court then found that "[Mother] has failed to demonstrate that she maintained regular visitation and contact with [G.D.], as required for the parental–benefit exception to apply." Substantial evidence supports that finding.

The history of Mother's visitation with G.D. was, in summary, as follows. G.D. was placed in protective custody on December 19, 2022, and parental rights were terminated on October 17, 2025—a period of about 34 months. From December 19, 2022 until March 17, 2023, a period of about three months, Mother made only "a handful of calls" with G.D., had no in-person contact with G.D., and missed an in–person visit scheduled for January 4, 2012. While Mother was incarcerated from March 17 through December 19, 2023, (about nine months) she regularly visited G.D. by telephone. As the juvenile court found, "[G.D.]'s receptivity to and engagement in the calls varied." From Mother's release from custody on December 19, 2023, until she was reincarcerated on April 12, 2024 (about

14

four months), Mother had only three in-person visits with G.D. even though Mother was authorized eight hours of monitored visitation each week.

While Mother was incarcerated from April 12 to May 9, 2024, she telephoned G.D. every day from jail. But after Mother was released from jail on May 9, 2024, she had no communication with the social worker until February 5, 2025—nearly nine months later. The social worker made many attempts to contact Mother, but her whereabouts remained unknown. After February 5, 2025, the social worker tried to communicate with Mother about scheduling a visit for February 15, 2025, but Mother did not respond. Finally, on March 6, 2024, Mother started a schedule of twice weekly in-person visits with G.D. Although Mother's visitation was generally consistent after March 6, 2025, there were many missed and canceled visits, and Moter often arrived late.

This record establishes that Mother's visitation, viewed over the entire course of the dependency proceedings, was not sufficiently regular and consistent to satisfy the requirements of the parental benefit exception. Most strikingly, there was an eleven-month gap in visitation between April 2024 and March 2025. During that gap, Mother had been authorized twice weekly eight-hour in-person visits with G.D. In addition to that gap, there was a three-month period from December 19, 2022 to March 17, 2023 when Mother had no in-person visits with G.D. and missed a scheduled visit, and a four-month period from December 19, 2023 to April 12, 2024, when Mother had only three in-person visits with G.D.

Starting in March 2025, Mother did participate in a visitation schedule, but—even putting aside missed visits, canceled visits, and late arrivals—this was too little too late. In *In re Breanna S.* (2017) 8 Cal.App.5th 636, 647, disapproved on another ground in *Caden C., supra,* 11 Cal.5th at

15

pp. 637, 638, fns. 6 & 7, the mother visited the child sporadically during the first 18 months of the dependency proceedings. Although the mother's visits became more regular during the final six months before the section 366.26 hearing, the Court of Appeal concluded those visits did not compel a finding that the mother had maintained regular visitation and contact. (*Ibid.*) In the present case, as in *Breanna S.*, Mother's regular visitation during the final months of the dependency proceedings did not render Mother's visitation and contact regular and consistent throughout the entire course of those proceedings.

### B. *Element Two: Substantial, Positive Attachment*

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]" (*Caden C., supra*, 11 Cal.5th at p. 632.)

The juvenile court found the second element of the parental benefit exception had been met. The court found: "[G.D.] loves her mother and the court finds that [G.D.] does have a substantial, positive emotional attachment to [Mother] [and] [G.D.] would benefit from continuing the relationship." That finding is not disputed.

### C. *Element Three: Detriment From Terminating Parental Rights*

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose

16

adoption. [Citations.]' . . . What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life. [Citation.] . . . [T]he effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet . . . a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C, supra*, 11 Cal.5th at p. 633.)

"In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights. [Citation.] That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent. [Citation.]" (*Caden C, supra*, 11 Cal.5th at pp. 633-634.)

The juvenile court in this case engaged in the "subtle, case-specific inquiry" required of it by *Caden C.*, made thoughtful findings, and did not abuse its discretion by determining that termination of parental rights

17

would not be detrimental to G.D. The court found: "[Mother] has failed to present any evidence that terminating her parental rights would have a destabilizing effect on [G.D.] Rather, both the evidence and the history have shown that the security of a stable home has been extremely beneficial to [G.D.] It has been able to mitigate the effects of not seeing or communicating with her mother, and the court has every reason to believe that the stability of an adoptive home will continue to do so. Therefore, the court finds that [Mother] has failed to demonstrate that any detriment to [G.D.] of losing her relationship with [Mother] outweighs the benefits of adoption."

G.D. benefited substantially from being placed in a stable home. SSA reports throughout the dependency proceedings show that G.D. benefited from placement. In December 2024, SSA reported that G.D. was developing at an age-appropriate level, was "energetic, sweet, kind, and playful," had made progress with potty training, and appeared "comfortable and happy" in M.H.'s care. In February 2025, SSA again reported that G.D. was "happy and comfortable" in M.H.'s care and enjoyed arts and crafts.

As a picture of what life would be like for G.D. in an adoptive home without Mother in her life, the juvenile court looked at the 11-month period from April 2024 to March 2025, when Mother had no contact with G.D. The court found G.D. did experience some instability in her life when her trial return to Father failed but, while in the sole care of M.H., G.D. "began to stabilize." Substantial evidence supports that finding. For example, as the juvenile court found, G.D. was doing better in school until March 2025, when visits with Mother resumed. After visitation resumed, M.H. noticed a "regression" in G.D.'s behavior and Mother's unreliability in visiting was making G.D. less emotionally stable.

18

Although the juvenile court found that G.D. had a substantial and positive emotional attachment to Mother, the court recognized that G.D. was conflicted about that relationship. As the juvenile court found, in June 2025 G.D. had told the social worker she "wanted a new mommy," loved M.H., viewed M.H. as her "'actual mom,'" and wanted M.H. to adopt her. One month later, G.D. told the social worker that although she still felt "great" about being adopted by M.H., she really wanted to live with Mother and that, as between Mother and M.H., did not want to "pick a side." G.D. also told the social worker, and testified at the section 366.26 hearing, that Mother had told her to say she wanted to live with Mother.

The juvenile court found that G.D. would "feel a sense of sadness" if parental rights were terminated. That is to be expected whenever a juvenile court finds termination of parental rights would not be detrimental to the child after finding a beneficial relationship under element two of the parental-benefit exception. The question is whether such sadness is of such a degree and would have such an effect that ending visits with a loving parent would "justify withholding the 'security,' 'stability,' and '"sense of belonging a new family would confer."'" (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 820.) Here, the juvenile court found, "[G.D.] has been sad when her mother has missed visits, but has quickly recovered, not exhibiting significant distress." As the trial court found, G.D. cried when in December 2023 she had her first in-person meeting with Mother in a year while, in March 2025, at the first in-person visit after an 11-month gap, "[G.D.] expressed curiosity as to where her mother had been." G.D. testified she "sometimes" cried when a visit with Mother ended. No evidence was presented that G.D. suffered substantial distress during 11 months in which she had no visits with Mother. For instance, in April 2024, SSA reported that G.D. did not appear to

be in any emotional distress without having visits or communication with Mother.

"There is no question that there are benefits in continued visits with loving parents to which the child has some substantial attachment." (*In re Andrew M., supra*, 102 Cal.App.5th at p. 820.) However, to establish the parental-benefit exception, a parent must prove "some type of harm beyond the fact that their loving visits would cease." (*Ibid.*) On that point, G.D.'s testimony is significant. During the hearing, G.D. testified that she missed Mother. When asked why she missed Mother, G.D. replied "[b]ecause I like to go shopping with her sometimes and like to play with her." G.D. then confirmed that shopping and playing were all that she missed about Mother. In other words, the harm G.D. would suffer if parental rights were terminated—the opportunity to shop and play—was simply the fact the visits would cease.

After nearly three years in the dependency system, several custodial placements, and lack of regular and consistent visitation from Mother, G.D. is entitled to the benefits provided by the security and stability of permanent placement in an adoptive home. Those benefits outweigh any harm any harm G.D. might suffer from severing parental rights, her love of and attachment to Mother notwithstanding.

## DISPOSITION

The order terminating parental rights is affirmed.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.